IN THE MATTER OF THOMAS F. O'GORMAN, III,
AN ATTORNEY-AT-LAW.

Argued April 23, 1985—Decided June 25, 1985.

*Thomas J. McCormick,* Chief of Hearings, argued the cause for Office of Attorney Ethics.

*Joseph Guez* argued the cause for respondent (*Guez & Haines,* attorneys).

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that disciplinary action be taken against THOMAS F. O'GORMAN, III, who was admitted to the bar of this State in 1968, and who formerly maintained offices in LYNDHURST and HASBROUCK HEIGHTS, and good cause appearing;

It is ORDERED that THOMAS F. O'GORMAN, III, is suspended for a period of three years, effective December 28, 1981, and until he can produce satisfactory medical proof of his fitness to practice law and until the further order of this Court; and it is further

ORDERED that THOMAS F. O'GORMAN, III, shall reimburse 1) the Clients' Security Fund for any monies expended on account of his derelictions and 2) the Ethics Financial Committee for the administrative costs of the proceedings; and it is further

ORDERED that respondent's restoration to the practice of law will be limited to respondent's practicing only in a supervised capacity and in a form of proctorship to be approved by the Office of Attorney Ethics. The proctor shall submit detailed reports on respondent's status, on a quarterly basis to the Office of Attorney Ethics, and it is further

ORDERED that respondent shall continue to his compliance with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended disbarred or resigned attorneys.

PER CURIAM.

Respondent, a member of the bar since 1968, has been under temporary suspension since December 28, 1981, pending resolution of charges now before us. That suspension resulted from a presentment that charged respondent with five complaints concerning a pattern of neglect, failure to carry out contracts of employment, and failure to communicate with clients, all of which occurred during the period from 1972 through 1980. The current charges are similar: four complaints of failure to communicate with clients, contrary to DR 6–101(A)(2); failure to carry out contracts of employment, contrary to DR 7–101(A)(2); exhibiting a pattern of neglectful conduct, contrary to DR 6–101(A)(2); and neglecting legal matters entrusted to him, contrary to DR 1–102(A)(6). The Disciplinary Review Board (DRB), acting on a presentment filed by the District IV Ethics Committee, summarized those four charges as follows:

## 1. SROKE COMPLAINT

Shortly after his eight-year old daughter was injured on August 3, 1972 in an accident, Michael A. Sroke of Elmwood Park retained respondent to handle the personal injury case. The girl was injured when a car struck her bicycle as she was crossing the street and she was thrown about ten feet from impact. She was treated for a sprained ankle and multiple contusions, with possible cerebral concussion, and then released

from the hospital. Sroke told respondent that his daughter might have a permanent leg injury and supplied respondent with photographs and related documents. Respondent had previously represented Sroke on other legal matters and had been recommended by a friend as being knowledgeable about personal injury cases. According to Sroke, there was no discussion at this initial meeting regarding respondent's fee arrangement or what legal course respondent contemplated pursuing.

Within a few weeks of this initial meeting, Sroke telephoned respondent inquiring about the status of the case. He then routinely telephoned respondent at least once a week, but spoke only with respondent's secretary, who informed him that respondent was in court. When Sroke went to respondent's office, respondent told him the case was proceeding. By letter dated May 31, 1973, respondent explained to Sroke that negotiations with the insurance company had "bogged down" and it was necessary to file a civil action. This civil complaint was filed against the driver of the car on June 11, 1973 after respondent received a $100 check from Sroke to cover costs. Respondent had anticipated that there would be substantial medical expenses in this case, but they never materialized. Respondent discussed this case with the insurance company, which initially offered only $99 and, eventually, increased it to $150. However, respondent was seeking about $400 to cover costs. Sroke, when informed of the $150 offer, rejected it. Respondent did not keep Sroke informed of his subsequent negotiations with the insurance company.

The civil action was dismissed by the court on November 22, 1974 for failure to prosecute. While respondent had prepared a motion to reinstate the complaint, he could not later recall why he did this because, in his opinion, the case was not worth reopening. He had not informed Sroke that the complaint had been dismissed.

When respondent was retained by Sroke, his law office was in Lyndhurst. In the summer of 1975, respondent moved his

office to Hasbrouck Heights. Respondent claimed he sent notices to some clients concerning the move, but not to those, such as Sroke, who he felt were aware of it. However, Sroke maintained he was not notified and learned the new office location through the telephone company. According to Sroke, respondent informed him that he had lost his papers on t᠎ . ᠎᠎᠎᠎e during the move, but he would try to locate them. Conversely, respondent contended he never told Sroke the file was lost, but that he could not immediately locate it.

Substantially later, Sroke received a letter from respondent stating he would receive $150 to reimburse him for his expenses. Respondent felt the case was not worth pursuing and decided to personally give Sroke the $100 he had expended, plus $50 above that. Respondent sent Sroke a $50 check on February 6, 1981, but it was returned for insufficient funds. Sroke then on April 7, 1981 filed a complaint against respondent with the Ethics Committee.

ANDOLENA COMPLAINT

Respondent was retained on behalf of William Cooper, 17, stepson of Charles A. Andolena, in 1976 concerning an automobile accident case. Respondent prepared a complaint to be filed in district court after determining when the statute of limitations would expire. He noted this date on an index card, which he affixed to the outside of the file, and gave the file to his secretary. However, the file was misplaced. When it was found, two months later, the statute of limitations had expired. Respondent took no action to file the complaint.

During the two-year period following the initial meeting with respondent, Cooper telephoned respondent between five to seven times. According to Andolena, respondent advised Cooper: "Don't worry, everything is in the works." Since Cooper was moving to Colorado, he gave his stepfather power of attorney to resolve this matter for him. Three weeks before Cooper left the state, respondent informed him that his secretary had forgotten to file the complaint and it was then too late to do so.

To rectify the situation, respondent agreed to pay off Cooper's educational note of about $1800. However, two or three days later, Cooper returned with Andolena, who demanded $3,000 or he would file an ethics complaint or a law suit. Respondent gave Andolena two postdated checks because he did not have sufficient funds to pay the total amount at one time. The checks were dated September 15 and 29, 1978; each was for $1,500. When Andolena cashed the first check, it was returned by the bank for insufficient funds. The bank informed Andolena that the account was closed. When respondent was confronted with this, he explained that he had expected a large settlement but it had fallen through. He promised to pay Andolena $50 a week. He paid about $700.

STOCKDALE COMPLAINT

Respondent was paid a $250 retainer by Gloria Stockdale on October 24, 1978 to represent her in obtaining a divorce from her husband. Respondent had been recommended to her by a friend whom he was representing in a pending divorce action. Respondent's office practice at that time would have been to have drafted the complaint after interviewing a client and to leave the paperwork to be followed-up by his partner who handled the office aspects of the practice. Respondent was the trial attorney in the firm.

Following that initial interview, Mrs. Stockdale was unable to contact respondent. She telephoned his office weekly; he was never there and did not return her calls.

In 1979, her husband was served with the legal papers. The summons was signed by respondent's partner. When she did not hear anything further about the case, she became suspicious. She went to respondent's office in Hasbrouck Heights, but no one was there. Although the office door was locked, respondent's name was still on the door. She assumed respondent had "left town." No one had informed her that in the summer of 1979 respondent had moved his office from Hasbrouck Heights to Ridgefield Park.

Mrs. Stockdale telephoned the Bergen County Clerk's office, which referred her to the office of the Clerk of Superior Court in Trenton, from whom she learned that the docket number on her complaint was not correct. She then communicated with the Bergen County Ethics Committee and the Clients' Security Fund. Her husband had retained his own attorney and had counterclaimed for divorce, which was granted on June 4, 1980. In February 1984, Mrs. Stockdale was reimbursed $250 from the Clients' Security Fund. The Ethics Committee had learned from the Clerk of the Superior Court that no complaint had ever been filed in the Stockdale matrimonial action; the docket number listed on the complaint had been assigned to another matrimonial case, the case of Mrs. Stockdale's friend, which respondent's firm was handling. Respondent maintained he had not written or used this docket number on the Stockdale complaint. He could not clarify this problem with his partner, who had left the area after being disbarred.

## HUBER COMPLAINT

Paulette Huber retained respondent in 1977 to file for divorce against her husband. A friend of hers had recommended him. In the initial interview there had been no discussion concerning legal fees. Over the following 15 months, Mrs. Huber paid respondent a total of $375. Although she attempted to communicate with him every other week, the only time she heard from him was when he wanted money. At those times, respondent would inform her that "everything is in court," and "we're working on it." He also informed her that a complaint had been filed, but neither she nor her husband had received any legal papers.

Although the legal papers were dated March 28, 1978, they were not filed until October 17, 1978. The matrimonial action charged constructive desertion and extreme cruelty. Respondent maintained that Mrs. Huber notified him that her husband was furious and vowed to fight for custody of the children if she pursued the divorce on those grounds. According to re-

spondent, she decided not to proceed with the matter. However, Mrs. Huber maintained that for economic reasons she decided to drop the divorce action. She and her husband attempted to reconcile their differences, but were not successful. Mrs. Huber maintained the respondent agreed to refund the unused balance of the retainer after deducting his fees but he never sent her a check. In August 1980, she decided to resume the divorce action and went to another attorney. When she communicated with respondent to obtain the original divorce papers, he told her he was in the process of moving his office and the papers were locked up. He promised he would write new ones. Respondent told her that she had about $200 left in her account and urged her to let him continue with the case. She decided to let respondent proceed and file for divorce under no-fault. She maintained that respondent explained to her that under this provision she and her husband could live in the same house for the 18-month period, but in separate bedrooms. She paid him $75 for filing fees. The complaint, dated January 2, 1981, was filed on January 29, 1981.

Respondent maintained, however, that Mrs. Huber had told him her husband was residing at his mother's house and would stay over in the marital home only to see the children. She also informed him that they had not had sexual relations during that period of time. Respondent contended that she could not afford to move from the marital home and that she wanted a no-fault divorce. Respondent claimed he was not told that she had attempted to reconcile with her husband for a brief period. He informed Mrs. Huber that the law required the spouses to live in separate residences, but she insisted that she wanted to proceed with a no-fault divorce.

Two months after her husband filed a counterclaim for divorce in February 1981, Mrs. Huber went to another attorney who advised her that the basis for divorce in her complaint was incorrect. Mrs. Huber maintained that when the matrimonial action was heard in court, the trial judge on his own motion dismissed her complaint and proceeded on the basis of her

husband's counterclaim. She maintained the judge said her complaint was incorrect and she should proceed against her attorney because he "messed up" her case.

Before the Ethics Committee respondent claimed that from 1977 through 1981 he was under a great deal of pressure, was involved in his own divorce proceedings, and had serious financial problems. He asserted that although he drank more than he should have, this problem did not keep him from pursuing the practice of law.

The Ethics Committee concluded that respondent had failed to communicate with his clients and had failed to fulfill contracts of employment. It further determined that respondent's conduct exhibited a pattern of neglectful conduct and that he had neglected legal matters entrusted to him.

The DRB agreed with the conclusion of the Ethics Committee, as follows:

> In each of the complaints here, respondent neglected his clients by failing to keep in contact with them and to keep them informed as to the development of their respective cases. In the Sroke matter, he did not relate his negotiations with the insurance company to his client so the client could realistically assess the strength and weakness of his lawsuit, especially after it was determined that the child-victim suffered only superficial injuries. This uncomplicated civil matter went unresolved for more than eight years.

> In the Andolena matter, respondent's office negligently failed to file a personal injury action on behalf of his client within the statute of limitations. Although respondent maintained that his partner handled the office routine while he was responsible for trials and other aspects of the practice, it was incumbent upon him to determine the status of the case when his clients telephoned him instead of just stating, "Don't worry, everything is in the works." The record indicated the clients were not informed that someone other than respondent would be involved in preparing their cases for trial.

> In the Stockdale matter, respondent's actions were particularly egregious. Respondent virtually disappeared after accepting Mrs. Stockdale's retainer to file for divorce against her husband. He apparently left her with the impression the divorce would be quickly processed. Her weekly telephone calls to his office went unanswered. About a year after the initial interview, her husband was served with the divorce papers and she waited expectantly to hear from respondent as to when the case would be heard in court. Again, nothing but silence. She was never informed that he had relocated his office. It was her husband's counterclaim for divorce that was granted. In February 1984, she was reimbursed $250 from the Clients' Security Fund for the unearned retainer.

In the Huber matter, the record reveals a lack of adequate communication with a client. There was no discussion or agreement as to the legal fee to be charged. Mrs. Huber, too, was unsuccessful in contacting respondent; she heard from him concerning only fee installments. When she later decided to have another attorney handle the case, respondent convinced her to let him continue with it. Again, he did not adequately communicate with her. She testified respondent advised her that she and her husband could reside in the same house but in separate bedrooms. Respondent, on the other hand, maintained that she informed him that her husband was residing at his mother's house.

Before an attorney can properly represent a client, the attorney must accurately obtain the facts, the guideposts from which the attorney will determine the legal course or strategy to follow. By obtaining the facts and keeping a client advised of the status of his case, an attorney displays a professionalism that will reflect creditably upon the Bar. In the Model Rules of Professional Conduct, alternate draft May 30, 1981, American Bar Association Commission of Evaluation on Professional Standards, it was noted that

[t]he lawyer must communicate to the client, *in language the client understands*, what the various available courses of action are and why the particular course of action was chosen over the others, before the action is taken. * * * Over half of the complaints received by the Committee on Professional Ethics and Conduct * * * are filed because the lawyer failed to properly communicate with the client [*Id.* at 186; Guadineer, "Ethics and Malpractice," 26 *Drake L.Rev.* 88, 115 (1976)].

Respondent's conduct in these cases exhibited a "pattern of negligence or neglect in his handling of legal matters." *Matter of Getchius*, 88 *N.J.* 269, 276 (1982); *DR* 6-101(A)(2). He failed to communicate with his clients, *DR* 6-101(A)(2), and to carry out contracts of employment, *DR* 7-101(A)(2). He also neglected legal matters that were entrusted to him, *DR* 1-102(A)(6).

In reviewing the record, the Board was concerned by respondent's practice of seeking to settle malpractice claims after ethics complaints were filed against him. If that practice were designed to insulate him from ethical charges or to frustrate the process of ethics complaints, it would violate the intent of *DR* 6-102(A).

We have given the record our careful independent review and have reached the same conclusions in respect of the respondent's ethical transgressions as are reflected in the DRB's decision. Respondent does not challenge either those conclusions or the DRB's recommendations, as follows:

After carefully reviewing the record, the Board concludes that if all the charges [referring to those preceding the December 1981 temporary suspension] had been heard simultaneously, the discipline recommended would have been a three-year suspension. See *In re Hollis*, 95 *N.J.* 253 (1984). For the most part, all the acts of misconduct occurred during the same time period, a time during which respondent's law partner was in charge of office manage-

ment while respondent was the trial attorney. Respondent's partner was disbarred on May 14, 1980. Although the charges here are serious and can have a detrimental impact on the confidence the public should have in the Bar of this state, no misappropriation of funds was involved. Respondent cooperated with the Ethics Committee throughout the lengthy proceedings against him. In contrast, see *In re Netchert,* 78 *N.J.* 445, 453 (1979).

\* \* \* \* \* \* \* \*

In addition to the recommendation that respondent be suspended from the practice of law for a three-year period, retroactive to the date of his temporary suspension, the Board recommends that prior to his readmission, he demonstrate by providing relevant medical and psychiatric evidence that he is capable of practicing law. *In re Goldstaub,* 90 *N.J.* 1 (1982).

The Board further recommends respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.

We accept the recommendation for a three-year suspension, retroactive to the date of respondent's temporary suspension, December 28, 1981. Likewise do we concur in the DRB's recommended condition for lifting of the suspension that respondent undergo a further psychiatric examination, at his expense, at the Adult Diagnostic & Treatment Center at Avenel, to demonstrate his fitness to practice. Further, respondent is to reimburse the Clients' Security Fund for any monies expended on account of his derelictions, and is to repay to the Ethics Financial Committee the administrative costs incurred on account of these proceedings.

We add a further condition. Upon fulfillment of the requirements set forth above, respondent may be readmitted to practice only in a "sheltered" environment—that is, under a form of proctorship. Again, respondent has no objection to such an arrangement, and we were assured at oral argument that Alfred Porro, Esq., of Lyndhurst, will accept the serious and burdensome responsibility of overseeing all aspects of respondent's practice. The precise details of that proctorship are to be approved by the Office of Attorney Ethics. The arrangement will be for a period of one year from the date upon which it is implemented, and until further order of this Court dissolving the proctorship. Mr. Porro is to submit to the Office of

Attorney Ethics detailed reports on respondent's status, on a quarterly basis and in a form acceptable to that Office.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*Opposed*—None.