IN THE MATTER OF GEORGE L. PAUK, AN ATTORNEY AT LAW.

Argued March 16, 1987—Decided June 19, 1987.

*Richard J. Engelhardt*, Assistant Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*George L. Pauk* argued the cause *pro se*.

On an order to show cause why respondent should not be disbarred or otherwise disciplined.

PER CURIAM.

This disciplinary proceeding arises out of five presentments filed by the District VIII Ethics Committee (the Ethics Committee), which concluded in each matter that respondent was guilty of unethical conduct. The Disciplinary Review Board (DRB) agreed with the Ethics Committee's finding of unethical conduct. Upon review of the first two presentments, involving the *Schiffner* and *Paulus* matters, the DRB recommended that respondent be temporarily suspended from the practice of law pending final disposition of all the ethics complaints against him. Decision and Recommendation issued December 15, 1982 (Decision No. 1). Accordingly, since January 18, 1983, respondent has been temporarily suspended from the practice of law.

Upon review of the last three presentments, involving the *Cicciari*, *Gyorke*, and *Sabo* matters, the DRB recommended that respondent be suspended for four years retroactive to the date of his temporary suspension. Decision and Recommendation issued December 4, 1986 (Decision No. 2). Three members of the DRB recommended that respondent be disbarred. One member of the DRB did not participate. Our independent review of the record leads us to accept the recommendation of the DRB, subject to the condition that respondent's practice be supervised by a preceptor approved by the DRB.

I

Respondent, a sole practitioner, was admitted to the bar in 1962. The presentments stem from five separate transactions.

We have independently examined the record and are satisfied that the DRB's determinations of the underlying facts in each

transaction are supported by clear and convincing evidence.[1] These facts are as follows:

A. *Schiffner Matter*

The respondent was retained by Walter G. Schiffner in July of 1976 to represent him in an action stemming from Schiffner's injury in an automobile accident on July 11th of that year. No retainer agreement was executed, and the client was not advised that he could retain respondent on an hourly basis. Mr. Schiffner in fact testified that there was no discussion of the fee to be charged.

A complaint was filed by respondent on behalf of Mr. Schiffner on November 21, 1976. The complaint was answered on July 27, 1977, after respondent agreed to an extension of time for defendants. Interrogatories were served on that same day.

On December 6, 1977, an order dismissing the complaint for failure to answer interrogatories was entered. Although respondent claimed that his client failed to return the interrogatories to him despite requests by letter and telephone over an 11 month period, the Committee found, based upon the client's testimony as well as references to certain dates within the interrogatories, that the client had cooperated and the interrogatories were completed in February of 1977.

The respondent further claimed that the first set of interrogatories were misplaced and complainant was therefore given another set in December, as well as that once the first set was again located, respondent was unable to obtain his client's signature on the document. He further stated that he advised his client of the dismissal. The client, on the other hand, stated that he was not advised at any time that his complaint had been dismissed, that he was never advised by respondent of the need for his signature on the interrogatories, that he and an attorney whose aid he enlisted had extensive difficulty in contacting respondent and, once contact was made, in November of 1978, the respondent lied to other counsel concerning the status of the case. Additionally, nearly one and one half years after the case was dismissed, Mr. Schiffner gave a $250 check to respondent, at respondent's request, allegedly to procure medical reports related to the case. The check bore the notation "Court costs and medical reports." Nonetheless, respondent claimed that the money was not for medical reports but was given as settlement on respondent's fee for handling the case. The check was thereafter cashed by respondent's secretary at respondent's request.

Mr. Schiffner further testified that in the Spring of 1980 he met with the respondent who advised that an offer to settle the case for $200 to $250 had been received, but respondent felt it could be doubled. The respondent did not recollect either the meeting or the offer.

---

[1]The *Schiffner* and *Paulus* facts are set forth in DRB's Decision No. 1; the *Cicciari, Gyorke* and *Sabo* facts are set forth in DRB's Decision No. 2.

In the *Schiffner* matter, the DRB concluded that respondent had harmed his client by failing to press his case; that he thereafter compounded his conduct by attempting to deceive his client, other counsel, and the Ethics Committee; and that he took money from his client under false pretenses, thereby violating *DR* 1–102(A)(1), (3), (4), (5) and (6); *DR* 6–101(A)(1); *DR* 7–101(A); *DR* 7–102(A)(3) and (8); and *DR* 9–102.[2]

B. *Paulus Matter*

In August of 1978, John E. Paulus, Jr. retained the respondent to represent his wife and himself in an action to recover damages for injuries sustained by Mr. Paulus at a lumber company. Mr. Paulus understood that respondent would receive 1/3 of the net settlement after deduction of $1,000 to pay respondent's costs and expenses. Respondent did not advise his client that he could be retained on an hourly basis.

By October 11th of that year, Mr. Paulus had also retained respondent to represent him in his divorce action. No specific fee was agreed upon at that time. Rather than withdrawing as Mrs. Paulus' attorney in the negligence action, respondent contacted her attorney in the divorce case to have her withdraw her *per quod* claim.

Prior to resolution of the matrimonial matter in March of 1980, Mr. Paulus requested respondent's assistance in forestalling demands of the mortgagees of complainant's marital home. No fee was discussed or agreed upon, and Mr. Paulus regarded the problem as one aspect of the divorce proceeding. A divorce was granted to the Paulus' on March 27, 1980. As part of the settlement, Mrs. Paulus was to receive $1,800 from the proceeds of the negligence matter. While respondent claimed that Paulus had agreed to the fee of $6,500, billed at the conclusion of the matrimonial matter, Mr. Paulus contended that respondent was not to be paid until the marital home was sold. Additionally, he stated that he did not receive any bills on the matrimonial matter, and that the $6,500 fee was ridiculous since, in addition to numerous telephone conferences with his client, respondent spent only one day in court and had only two meetings with his wife and her counsel. The attorney who represented Mrs. Paulus testified that his fee was only $1,500 but that a fee of $3500 by respondent "would not be out of line." Respondent contended that although his fee was originally to be $3500, he raised that fee by $3,000 after successfully rebuffing Mrs. Paulus' alleged claim for a $10,000 payment as part of the property settlement.

---

[2]Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern the conduct of the members of the bar of this State. *R.* 1:14. Respondent's actions occurred prior to this date, and are consequently governed by the Disciplinary Rules then in force.

The negligence action was settled in September of 1980. Respondent deposited a settlement check for $27,500 in his trust account on September 18, 1980. On the next day, he disbursed to himself $9,333 which represented his fee in the negligence matter. Mr. Paulus claimed that he authorized no further disbursements to respondent. Thereafter, Mr. Paulus received a check for $10,000 from respondent dated October 2, 1980. On October 14th, respondent disbursed to himself a fee of $1,571.25 which allegedly represented his fee of $1,245 for the "mortgage negotiation" and miscellaneous costs related to the divorce proceeding, and $6,500 which represented his fee in the divorce proceedings.

The respondent stated that he had spent four to five hours dealing with the problems related to the mortgages on the marital home. He indicated that his actions saved his client five or six mortgage payments, so he felt it was appropriate to take a fee equivalent to one month's mortgage payment, and that Paulus agreed to this action. This is disputed by Paulus.

On or about November 10, 1980, the respondent endorsed over to John Paulus a check for $2,500.00 which was payable to respondent, and drawn on funds owed as a fee by another client. The check in question was not initially deposited in his business account, contrary to *R.* 1:21–6. The respondent claimed that the $2,500.00 was a loan to his client; John Paulus contends that the money was a partial payment of the remainder of the settlement proceeds, and that respondent had promised that the balance would be paid by the end of the week.

The DRB found in the *Paulus* matter that respondent had engaged in a continuing conflict of interest by representing Mr. Paulus in the matrimonial action without Mrs. Paulus' consent after representing both in the negligence action; overreached his client by charging excessive fees on two occasions; and wrongfully withdrew an unapproved fee from his client's trust funds. The DRB therefore determined that respondent had violated *DR* 1–102(A)(1), (3), (4) and (6); *DR* 2–106, *DR* 5–105, *DR* 9–102(A)(2), *DR* 9–102(B)(4), and *DR* 9–102(C).

C. *Cicciari Matter*

Respondent was retained by Mr. and Mrs. Gus Cicciari to represent them for injuries suffered in an automobile accident on October 19, 1973. Respondent, through his then wife, was related to the Cicciaris. He filed a lawsuit on their behalf on October 16, 1975.

Benjamin Cicciari, son of Mr. and Mrs. Cicciari, had numerous conversations with respondent regarding the personal injury lawsuit. Each time respondent assured him that the case was moving along. Shortly after the accident, Mrs. Cicciari became disabled and was hospitalized. When Benjamin Cicciari received respondent's letter of June 18, 1976 regarding interrogatories, he informed respondent of his mother's condition and that she was not able to answer the questions. While he could not specifically remember taking his father to respondent's office to answer interrogatories, Benjamin Cicciari did recall accompanying his elderly father a number of times to respondent's office.

However, respondent maintained at the ethics proceeding that while Gus Cicciari could understand the questions, he could not respond to them due to his stuttering. Respondent added that he considered Gus Cicciari to have been senile. Respondent maintained that he informed Benjamin Cicciari at least once that his father could not answer the questions and that the lawsuit would be dismissed. Conversely, Benjamin Cicciari testified that respondent never indicated there were any problems. The lawsuit was dismissed on November 17, 1976 due to plaintiff's failure to answer interrogatories. A third-party action in the lawsuit was dismissed on March 11, 1977. Respondent did not inform either Gus Cicciari or Benjamin Cicciari by letter the lawsuit had been dismissed. In 1980, Benjamin Cicciari learned the identity of the insurance company representing the defendants in the civil action. In a telephone conversation with that company, he was told that the lawsuit had been settled for $10,000. He immediately confronted respondent with this information and demanded to know where the money was. Respondent replied that the information was incorrect. Benjamin Cicciari later received a letter from the insurance company stating that there had been no settlement. Respondent told Benjamin Cicciari that the case was still pending. Benjamin Cicciari claimed respondent informed him that there had been an offer to settle the case for $1,500 which respondent rejected because he did not consider it to be enough. However, respondent denied this.

Sometime that same year Benjamin Cicciari learned from official court records that the lawsuit had been dismissed. When he questioned respondent about this, respondent replied that the information was not correct. Respondent later told him that the dismissal did not refer to his parents' lawsuit but to a third-party action.

At the ethics committee hearing, respondent stated that he had made no attempt to settle this case before it was dismissed because he could not get the answers to the interrogatories. After dismissal, he also did not try to restore the case to the active calendar. When respondent learned that the insurance company had reserved $4,000 for this case, he did not seek a settlement.

The DRB determined that respondent had been grossly negligent in his handling of the Cicciaris' case, by failing to conscientiously represent his clients and failing to carry out his contract of employment, in violation of DR 6–101(A)(1) and DR 7–101(A)(2) and (3).

D. *Gyorke Matter*

Mrs. Ethel Gyorke had been a long time friend and client of respondent. She "always trusted him." Respondent had represented her in connection with the sale of her deceased father's house from which she netted at least $20,000. This money was received in April 1979.

Respondent asked Mrs. Gyorke for a loan, stating that he needed the money for a new office. He told her that he would pay her the same interest rate she would receive from a bank. Mrs. Gyorke agreed and ultimately made three loans to respondent. At the ethics committee hearing, she stated that

... I thought I'm helping a trusted friend—I gave him the monies. The first event occurred on April 11, 1979 when respondent borrowed $6,000 from her at 7% interest to be repaid in two years. On June 8, 1979 respondent borrowed an additional $12,000 at 10.5% interest to be repaid in 18 months. On October 11, 1979 respondent borrowed an additional $1,500 to be repaid at 10% interest within one year. He did not discuss with her whether these loans would be secured and did not advise her to discuss these transactions with independent counsel. During this time respondent also represented her in an inheritance matter.

In late 1980 some of the notes became due. Mrs. Gyorke told respondent she had an emergency home repair situation and needed the money. She only received a portion of what was due. A $2,000 check respondent had given her had been returned for insufficient funds. Respondent maintained that when he gave her the check he informed her to notify him before she cashed it. Respondent eventually made good on this check.

When the total money due was not repaid, Mrs. Gyorke retained another attorney and commenced legal action against respondent. The complaint demanded repayment of the $12,000 and $1,500 notes. The $6,000 note had been repaid by this time. Respondent eventually repaid Mrs. Gyorke the monies due including interest and made some contribution toward her legal fees. She then signed an agreement which released respondent from any claim she might have regarding the notes. Mrs. Gyorke then had this attorney assume the inheritance litigation in which she was involved.

At the ethics committee hearing, Mrs. Gyorke stated that this incident involving respondent had given her great alarm and she suffered emotional and physical stress over it. She stated that she had had difficulty in contacting respondent. Respondent maintained that he was not aware that these loans were a violation of the disciplinary rules.

The DRB concluded that respondent improperly entered into a business relationship with his client by borrowing $19,500 from her without explaining the need for her to consult with independent counsel. Moreover, in violation of *DR* 5–104(A), respondent failed properly to secure the loan. *See DR* 1–102(A)(6) ("A lawyer shall not [e]ngage in any ... conduct that adversely reflects on his fitness to practice law.")

E. *Sabo Matter*

Respondent was retained by Helen M. Sabo who had been issued three traffic summonses on May 13, 1979 for driving while under the influence of alcohol, leaving the scene of an accident and careless driving. Respondent told her that his fee would be $3,500 which would include litigation expenses. At the ethics hearing, respondent stated that he generally charged about $1,000 for municipal court matters. However, he believed this higher fee was justified based upon his expertise, and the fact that although he was busy with other matters Mrs. Sabo was insistent that he defend her. Mrs. Sabo was not informed what

portion of this retainer represented legal fees and what portion represented expenses. She was told that any unused funds would be returned to her. Respondent conducted the expected defense work in preparing for trial, including interviewing Mrs. Sabo, reviewing police reports, questioning witnesses and examining the accident scene. He also retained an expert. The municipal matter had been adjourned a number of times before it was finally tried. Following a trial on July 15, 1980, Mrs. Sabo was found guilty of driving while under the influence and fined $210 which she paid by check. She was acquitted of the other charges. She had expected that this sanction would have been paid out the $3,500 she had given respondent but he informed her that the fine was her responsibility.

After the trial, Mrs. Sabo requested respondent supply her with an accounting of his fees and costs. He told her he would send a bill but never did. Mrs. Sabo's certified letter of January 3, 1981 to respondent was returned unclaimed. She wrote another letter on January 29, 1981 and placed it under respondent's office door.

However, she received no response. When she did communicate by telephone with respondent, he advised her to come to his office but she was not able to do so because she was leaving the state.

At the ethics committee hearing, respondent claimed that Mrs. Sabo never requested a refund. He stated that he had no reason for not responding to her or for not picking up the certified letter. Respondent informed the committee that there was nothing unusual about this case and that he probably spent about 35 hours on it. He paid the expert no more than $350 and other expenses totalled less than $50. He conceded that he never sent Mrs. Sabo an accounting.

The DRB concluded that respondent had charged his client a fee that was substantially higher than a reasonable fee and that he had failed to provide his client with an accounting as repeatedly requested, contrary to DR 1–102(A)(1) and (6), DR 2–106(A) and (D), and DR 9–102(B)(1) and (3).

## II

Based upon our review of the entire record, we are satisfied by clear and convincing evidence that respondent is guilty of unethical conduct. Respondent's ethical transgressions spanned a period of five years from 1976 through 1980. We are not dealing with one isolated incident of aberrant behavior but rather a pervasive pattern of neglect, misrepresentation, and overreaching. While the DRB found no mitigating circumstances in this case, we note that respondent was going

through a divorce after a marriage of twenty years and his misconduct in the *Cicciari* and *Schiffner* matters do not appear to be the result of a desire for self-enrichment but rather the result of very poor lawyering.

Nevertheless, the court is disturbed by respondent's attitude. He appears not to comprehend fully the seriousness of his transgressions, nor to understand that his problems are the result of his own actions and not that of his clients. He shows a complete lack of understanding of the relationship of trust and confidence that should exist between an attorney and his client.

Although respondent's transgressions are serious, his conduct completely unprofessional and certainly adversely affecting the confidence of the public and the bar, yet his acts are similar to and do not appear any more serious than those of the respondents in *In re Johnson*, 105 *N.J.* 249 (1987); *In re Noonan*, 102 *N.J.* 157 (1986); *In re O'Gorman*, 99 *N.J.* 482 (1985); and *In re Templeton*, 99 *N.J.* 365 (1985). In each of those cases we found respondents guilty of similar infractions. In all of those cases, each act of misconduct considered alone, would not have resulted in the respondent's disbarment. The issue in those cases, as in this case, was whether based on the totality of all of respondent's ethical infractions, respondent's conduct merited disbarment. In none of those cases did we hold that the respondent's conduct warranted disbarment.

In *In re Johnson, supra,* 105 *N.J.* 249, we found that the respondent had committed numerous ethical infractions, including a pattern of neglecting his clients' legal matters, failing to carry out contracts of employment, keeping retainers without performing services, commingling clients' trust funds, failing to account to his clients, and most importantly, misusing clients' funds. In that case, we did not disbar respondent. Instead we continued his temporary suspension from the practice of law, which had lasted for a period of slightly over four years and stated that upon his application to have the suspension vacated,

we would consider the propriety of having his readmission conditioned upon his making full restitution to the Clients' Security Fund and the imposition of other conditions that he would have to fulfill, particularly in respect to his engaging in practice as a sole practitioner.

In *In re Noonan, supra,* 102 *N.J.* at 164–65, based on our independent review of the record, we agreed with the following DRB findings of unethical conduct on the part of respondent:

> The complaints against Respondent reveal a pattern of neglect of clients' legal problems. In Bonnar, he failed to perfect a criminal appeal. In Meehan and Dubin, he failed to follow through with civil litigation and in Matoro he did not file a civil suit. In the Gebrian and Schaefter matters, he failed to properly administer these two estates. The Board finds Respondent neglected legal matters in such a manner that his conduct constituted gross negligence, *DR* 6–101(A)(1) and that he failed to carry out contracts of employment, *DR* 7–101(A)(2). His conduct adversely reflected on his fitness to practice law, *DR* 1–102(A)(1) and (6). As a result of a DEPS audit of Respondent's trust account and records, the Board finds that he failed to maintain his books and records as required by *R.* 1:21–6. The Board further finds that Respondent failed to preserve the identity of clients' funds, *DR* 9–102 and this adversely reflected on his fitness to practice law, *DR* 1–102(A)(1) and (6).

In *Noonan* we did not disbar counsel but concluded that respondent's temporary suspension, which had lasted five years, constituted a sufficient discipline.

In *In re O'Gorman, supra,* 99 *N.J.* 482, respondent committed several ethical infractions that demonstrated a pattern of neglect and misrepresentation to his clients. As we set forth at 99 *N.J.* at 490–91:

> [R]espondent neglected his clients by failing to keep in contact with them and to keep them informed as to the development of their respective cases. In the Sroke matter, he did not relate his negotiations with the insurance company to his client so the client could realistically assess the strength and weakness of his lawsuit, especially after it was determined that the child-victim suffered only superficial injuries. This uncomplicated civil matter went unresolved for more than eight years.
>
> In the Andolena matter, respondent's office negligently failed to file a personal injury action on behalf of his client within the statute of limitations.
>
> \* \* \* \* \* \* \* \*
>
> In the Stockdale matter, respondent's actions were particularly egregious. Respondent virtually disappeared after accepting Mrs. Stockdale's retainer to file for divorce against her husband.
>
> \* \* \* \* \* \* \* \*

In the Huber matter, the record reveals a lack of adequate communication with a client. There was no discussion or agreement as to the legal fee to be charged. Mrs. Huber, too, was unsuccessful in contacting respondent; she heard from him concerning only fee installments. When she later decided to have another attorney handle the case, respondent convinced her to let him continue with it. Again, he did not adequately communicate with her.

In *O'Gorman* we agreed with the DRB's conclusions that the "charges here are serious and can have a detrimental impact on the confidence the public should have in the Bar of this state." *Id.* at 492. Nevertheless, we did not disbar the attorney but imposed a three-year suspension, retroactive to the date of respondent's temporary suspension subject to a psychiatric examination of respondent's fitness to practice law and his practicing under a proctorship.

In *In re Templeton, supra,* 99 *N.J.* 365, we found respondent guilty of numerous instances of misconduct, including a pattern of neglect of clients' legal problems, improper refusal to return unearned retainers, failure to carry out contracts of employment, misrepresentation of status of cases to clients and failure to cooperate with the Ethics Committee. In that case also we did not disbar respondent but concluded that a five-year period of suspension was appropriate to protect the public interest and commissioned his readmission to practice law on his undergoing a psychiatric examination to evidence his fitness to practice law, his making full restitution to the Clients' Security Fund, and his working in a supervised capacity.

We are mindful that the purpose of discipline is not to punish the offender but to protect the public from the attorney who does not meet the standards of responsibility of his profession. *In re Noonan, supra,* 102 *N.J.* 157 at 165 (1986). In *In re Nigohosian,* 88 *N.J.* 308, 315 (1982), we stated that "severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all the relevant circumstances." Like the respondents in *In re Johnson, supra,* 105 *N.J.* 249; *In re Noonan, supra,* 102 *N.J.* 157; *In re O'Gorman, supra,* 99 *N.J.* 482; and *In re Templeton, supra,* 99 *N.J.* 365, respondent's infractions are serious and numerous. Neverthe-

less, like those cases, we do not find that the record supports a conclusion that respondent's conduct warrants disbarment.

Hence, we agree with the DRB's recommendation that respondent's temporary suspension from the practice of law on January 18, 1983, over four years ago, is sufficient discipline for the misconduct committed here. However, respondent's failure to recognize the seriousness of his misconduct and his responsibility for that misconduct demonstrates that he is not sufficiently responsible at this time to practice law as a single practitioner. Consequently, we have concluded that the right of respondent to resume practice shall not be restored except under conditions assuring that he will be subject to the supervision of another attorney, both the conditions and circumstances surrounding that supervision, as well as the supervising attorney, to be satisfactory to the Office of Attorney Ethics and approved by the DRB. Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts.

So ordered.

*For suspension* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.

## ORDER

This matter having been presented to the Court on the recommendation of the Disciplinary Review Board that the discipline to be imposed upon GEORGE L. PAUK, of NEW BRUNSWICK, who was admitted to the bar of New Jersey in 1961, be limited to the time he has served since his temporary suspension from the practice of law on January 18, 1983, and good cause appearing;

It is ORDERED that the suspension of GEORGE L. PAUK from the practice of law shall continue until the further order of the Court; and it is further

ORDERED that GEORGE L. PAUK is eligible to apply for his restoration to the practice of law under *R.* 1:20–11(h); and it is further

ORDERED that until the further order of the Court, the restoration of GEORGE L. PAUK, shall be subject to the condition that his practice be supervised by a preceptor to be approved pursuant to Administrative Guideline No. 28; and it is further

ORDERED that respondent shall continue to be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent reimburse the Ethics Financial Committee for the appropriate administrative costs arising out of the prosecution of this disciplinary matter, including the production of transcripts; and it is further

ORDERED that respondent continue to comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys.