IN THE MATTER OF EDWARD J. ROSNER, AN ATTORNEY AT LAW.

November 7, 1988.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that EDWARD J. ROSNER, formerly of PRINCETON, who was admitted to the Bar of this State in 1975, be publicly reprimanded for 1) serving his own interests in derogation of his obligations of fidelity to his clients' interests, in violation of *DR* 5–104, *DR* 5–105, and *DR* 5–106; 2) gross negligence, in violation of *DR* 6–101; and 3) misrepresentation, actions prejudicial to the administration of justice, and misconduct that adversely reflect on his fitness to practice law, in violation of *DR* 1–102(A)(4), (5) and (6), and good cause appearing;

It is ORDERED that the findings and determinations of the Disciplinary Review Board are hereby adopted and respondent is publicly reprimanded; and it is further

ORDERED that the full record of the matter be added as a permanent part of the file of said EDWARD J. ROSNER as an attorney at law of the State of New Jersey; and it is further

ORDERED that EDWARD J. ROSNER reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

4

## APPENDIX

*Decision and Recommendation of the*
*Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter is before the Board based upon a presentment and a recommendation for private reprimand resulting from two separate District VII (Mercer County) Ethics Committee hearing panel reports. The facts may be summarized as follows.

In 1976, respondent formed a law partnership with another attorney in Princeton. By this stage in his career, he had acquired a specialty in corporate securities law and avoided courtroom litigation. In the summer of 1978, respondent's partnership merged with another law firm; respondent remained a partner and practiced almost exclusively in his specialty.

By early 1981, respondent's relationship with his partners had deteriorated. On February 10, 1981, respondent withdrew from the law firm and began practicing as a sole practitioner. By the following May, however, he had joined another small law firm in New Jersey. This association, too, did not last.

In February 1983, respondent joined a Philadelphia, Pennsylvania, law firm as a partner. There he could, once again, specialize in corporate securities law. Respondent remained with that firm until May 1985, when he began working as general counsel to a large public company. By 1986, respondent stopped practicing law altogether.[1] He is now vice-president and chief executive officer of this public company.

Respondent has a history of serious medical problems. In early 1972, respondent had a mild heart attack and was thereafter subject to severe angina attacks and frequent hospital-

---

[1] As of 1986, respondent was listed as inactive with the Clients' Security Fund.

izations. In late 1972, a laminectomy was performed and one of his disks was removed. In 1974, his heart problems caused him to refrain from working for nearly a year. On July 4, 1980, respondent suffered a severe angina attack and was scheduled for a coronary catheterization. About four days before the surgery was to be performed, he was admitted to the hospital on an emergency basis with severe chest pains. It was not until August 1980 that respondent was able to return to work. In January 1981, respondent suffered another severe angina attack that required hospitalization. He remained hospitalized until February 9, the day before he withdrew from his law partnership. Arterial bypass surgery was performed on respondent in June 1983. Unfortunately, surgery did not cure respondent's medical problems, and he was hospitalized again in March 1984 and on New Year's Day 1985.

From his first heart attack in 1972, respondent's doctors continually cautioned him to avoid any and all stress. Respondent claimed he first sought to do this by avoiding litigation but was ultimately able to do so only by leaving the practice of law, which he did in 1986. He further claimed that his medical problems have been under control since that time.

Respondent's wife also has a long history of severe medical problems. She underwent surgery for a malignancy shortly after her marriage in 1965. Following that, she had treatment for leukemia. In December 1980, she again had surgery, this time for removal of her thyroid. About a year later, she underwent more surgery and had a complete hysterectomy. Respondent claimed his wife's medical condition also affected his actions and contributed to the stress under which he operated.

The two separate matters underlying these ethics proceedings occurred from 1977 through 1984. The facts of each follow.

## APPELBAUM MATTER

In 1977, Sabina Appelbaum learned that in 1976 one of her former attorneys had ineffectively prepared a deed which was supposed to transfer title to the marital residence from both spouses back into her name only. As a result, when her second husband suffered business losses and was forced into bankruptcy, his interest in the house was sold at a sheriff's sale. Sabina Appelbaum was forced to repurchase her husband's former interest.

Thereafter, Sabina Appelbaum determined to seek redress from the attorney who had prepared the deed of transfer. Unable to find an attorney within the same county who would handle the legal malpractice action, she was referred to respondent by her brother, an officer or trustee of the New Jersey Veterinarian Association. This Association was a client of respondent's law firm. She and her husband met with respondent in his office on November 8, 1977. Both the Appelbaums and respondent agreed respondent was retained to handle the case. However, the parties disagreed on the particulars of his retention.

The Appelbaums testified before the district ethics committee that respondent informed them he would take the case on a contingent fee basis, but no written agreement to this effect was signed. According to the Appelbaums, he also opined the matter would be settled prior to any actual court hearing. The Appelbaums claimed he never informed them he would not personally handle the matter if court appearances were required. They also testified they informed respondent the estimated damages were $6,500.

Contrariwise, respondent testified there never was a contingent fee agreement. Rather, after his partner's consent, he informed the Appelbaums there would be no fee, given the Veterinanian Association's status with the law firm. Hence, there was no written fee agreement. Further, respondent testified he informed the Appelbaums that one of his associates,

and not he, would handle any and all court appearances, because his health did not permit him to appear in court. Finally, respondent's recollection of the estimated damages as stated by the Appelbaums was $2,500.

In the summer of 1978, shortly after respondent's firm had merged with another Princeton law firm, respondent testified he informed the Appelbaums that the matter could not be settled and that someone other than he would be handling the courtroom work. He again emphasized he simply could not litigate because of his health. He testified he transferred the file to an associate by memo, but there is no copy of the memo or any other corroborative evidence in the record.

At some point following this meeting with the Appelbaums, both parties testified respondent was retained to incorporate their new business venture. He prepared all documents of incorporation for both the operating and the holding companies, as well as the documents for the transfer of the real estate wherein the business was to be located. Once again, there is a dispute as to the fee arrangement. The Appelbaums testified respondent requested a stereo from their store in lieu of cash. Respondent testified he provided these legal services on a no fee basis.[2]

At some point thereafter, Sabina Appelbaum claimed she slipped and fell in a supermarket, sustaining some mild injuries. Her medical bills totaled approximately $584. She testified she contacted respondent about the possibility of commencing a personal injury action against the supermarket. She testified further respondent agreed to handle the matter on a contingent fee basis, although, once again, there was no written agreement

---

[2]Respondent confirmed he obtained a stereo from the Appelbaums' store. He testified, however, that he paid by check, in the amount of $584. Furthermore, he made the check payable to Sabina Appelbaum, rather than the business, at her request. The Appelbaums testified they received a check in that amount, but that it was tendered as settlement for respondent's failure to institute suit in an unrelated matter.

executed. The Appelbaums testified respondent informed them about four months later that he had obtained a check from the supermarket's insurance carrier in the amount of $7,000, but that he had returned the check without consulting them, because he believed the amount to be exorbitant for the injuries sustained. They asserted respondent then tendered a check in the amount of $584 in settlement, because that was the amount of Sabina Appelbaum's medical expenses. Respondent flatly denies this entire episode.[3]

During 1980 and for portions of 1981, both parties testified that the Appelbaums' queries concerning the status of their malpractice action received the same answer from respondent: the suit had been instituted, but nothing yet had been received from the court. Respondent testified he made these assertions based on information obtained from the associate handling the litigation. Respondent, however, could not identify the responsible associate.

In April 1981, after respondent had withdrawn from the Princeton law firm, he testified he was contacted by the Appelbaums once again concerning the legal malpractice action. He testified they requested he obtain their files and continue as their attorney. Respondent obtained releases from them but believing his continued representation was for work associated with their business venture, obtained only those files at that time.

In the summer of 1981, shortly after respondent's association with a small New Jersey law firm, the Appelbaums' daughter and son-in-law retained respondent to prepare documents in a real estate matter. Respondent completed this work to the clients' satisfaction.

Respondent testified he first discovered the malpractice suit had never been instituted on October 30, 1981, after personally checking the court records. He testified he then explained to

---

[3]See footnote 2, *supra,* for respondent's explanation of the $584 check.

the Appelbaums that the case had never been filed and that they had a cause of action against him both civilly and ethically.[4]

Conversely, the Appelbaums testified they became concerned about the status of the malpractice suit when they learned of respondent's failure to institute the personal injury action. They then personally checked court records in both the county and the state clerks' offices. After learning that the action had never been filed, they contacted respondent. At the ensuing meeting, the Appelbaums testified respondent never informed them they had a right to sue civilly or to pursue an action with the ethics authorities.

Both parties agreed a settlement was ultimately reached, but they disagreed about its terms. Respondent testified the parties agreed on $5,000 as full settlement. He testified that he returned to the Appelbaums' store on November 19 with a check in the amount of $5,000, but postdated it to November 23. He testified further that the Appelbaums subsequently telephoned him and requested cash instead. He brought the cash in lieu of check on November 24 or 25. However, when he requested return of his personal check, the Appelbaums informed him they did not have it at the store. Respondent then prepared a handwritten receipt, which Appelbaum signed. Respondent testified he could not locate that receipt.

The Appelbaums testified the agreement was for a total of $10,000, payable in two $5,000 installments. They offered in evidence respondent's check dated November 23, 1981, on which was written, "partial payment—balance due $5,000—cash settlement for a case never filed in court—properly in court. Negligence." Sabina Appelbaum acknowledged that the notation on the check, written with two different pens, was in her

---

[4]Respondent testified that, although he knew there was a six year statute of limitations, he simply assumed the statute had passed and was unaware he was still within time to institute suit.

handwriting. She testified, however, that this notation was made immediately following respondent's tendering of the check and in his presence. Respondent denied this.

After handing the Appelbaums $5,000 in cash, respondent claimed he believed the matter had been satisfactorily settled. However, in early 1982, he began receiving telephone calls from the Appelbaums demanding a second $5,000 payment. Although he resisted at first, he claimed he subsequently consented, specifically to avoid the filing of any complaints or actions against him which they threatened. He, therefore, tendered a second check in the amount of $5,000, but again was forced to postdate the check. He asserted he received the Appelbaums' pledge not to deposit that check until he notified them there was sufficient money to cover the payment. When this check was twice returned for insufficient funds, Sabina Appelbaum demanded an additional $2,500 payment. Accordingly, respondent testified he prepared and signed a $7,500 promissory note. Thus, he felt the note was signed under duress.

The Appelbaums' testimony differed sharply. They claimed respondent was obligated to make a second $5,000 payment. Respondent once again tendered a postdated personal check. The check had been twice returned for insufficient funds. Having received cash for the check, the bank then removed $5,000 from Sabina Appelbaum's Individual Retirement Account to cover the amount. Furthermore, when they contacted respondent and demanded a cash payment, they asserted that respondent instead prepared a promissory note in the amount of $7,500. Respondent signed the note on April 5, 1982. By its terms the entire principal and interest was to become due and payable 15 days later. When respondent failed to make payment, the Appelbaums filed a complaint with the ethics authorities.

The committee concluded respondent had undertaken representation of the Appelbaums in the malpractice matter on a contingent fee basis and had failed to prepare a written fee

agreement, in violation of *R.* 1:21–7(g). Furthermore, albeit inadvertently, he provided inaccurate information concerning the status of that action several times. Respondent retained an obligation to follow through on the matter, even after turning it over to an associate. His failure to do so violated *DR* 7–101(A)(2). As to the many other allegations, the panel concluded there was no clear and convincing evidence to sustain them. The committee recommended respondent be privately reprimanded.

SCHOEMAKER MATTER

In 1979, Eric Schoemaker began a business investment and consulting venture, Graylion Investments, Inc. (Graylion). In 1980, he retained respondent's law firm as counsel. Initially, he sought aid in registering Graylion with the Securities and Exchange Commission. Schoemaker was introduced to respondent, a securities law specialist.

Sometime during early 1980, Graylion was hired by Helen Marie Davis as a consultant to her business venture, Cooke Inlet and Exploration Development (CIED). CIED was attempting to develop property in Alaska. This land contained minerals, one of which was gold. CIED was seeking to mine the gold contained therein.

In mid–1980, Schoemaker introduced Davis to respondent's law firm. Throughout the remainder of 1980 and early 1981, the firm engaged in varied activities on behalf of Davis and CIED. It ultimately billed CIED a total of $251,745.46. Respondent rendered some of the services included in this statement.

During this same time frame, it appears as if some services were also performed for Schoemaker and Graylion. Although testimony differed on this point, the evidence disclosed Schoemaker did visit respondent occasionally. The firm finally withdrew its representation of Schoemaker on February 9, 1981.

By early 1981, respondent had located potential investors in the CIED venture, who were willing to provide $500,000. To

consumate the agreement, however, Davis had to clear all judgment liens on the Alaskan property. One such lien was for overdue taxes; the property was, therefore, subject to imminent foreclosure. The parties agreed approximately $100,000 was needed to clear the tax lien. A friend of Schoemaker's, a Dutch citizen, agreed to lend him the money. Schoemaker, in turn, would lend the money to Davis and CIED. No collateral supported the Schoemaker-to-Davis loan. However, on January 29, 1981, respondent agreed to be

> personally responsible to you [Schoemaker] for 50 percent of any loss that is incurred. Said payment shall be made from existing assets owned by me at the time of the default together with current income generated by me in the event future assets are insufficient for the payment.

Three days later Graylion resolved to increase the number of directors from two to three. Respondent was appointed as the third director, along with Schoemaker and his wife.

On February 9, 1981, $100,000 was electronically transferred to the trust account of respondent's law firm. Respondent then personally authorized the transfer of the entire amount out of that account. He arranged for the money to be transferred first to Schoemaker and finally to Davis. All requisite documents to effectuate the two loans were prepared by respondent. Except for one document, all were executed at that time.[5]

Two of the partners in the law firm testified they were unaware of any of these agreements or transactions until the money was actually deposited in the firm's trust account. In any event, on February 10, immediately following respondent's transfer of the $100,000 out of the firm's account, the firm held a partner's meeting. As a result, respondent resigned from the partnership. In accordance with the partnership agreement, respondent was treated as a withdrawing partner. Beginning one week later and continuing for the next year, respondent

---

[5] Inexplicably, the second mortgage on Schoemaker's personal Princeton residence, which was owned by Graylion, was not executed for a full year.

received weekly checks to cover his draw as a withdrawing partner. He also received the full amount of his capital account as soon as the accountant verified the amount.

Respondent apparently considered challenging the validity of the partnership agreement and anticipated problems concerning his capital account and his relationship to the CIED venture. He consulted with another attorney. Within three weeks of his withdrawal from the firm, he had retained that attorney to represent him in these matters. He eventually tendered two personal checks to cover the requested retainer, both of which were returned for insufficient funds.

By this time, respondent's business bond with Schoemaker had become even stronger. On March 2, 1981, respondent was appointed executive vice president and chief executive officer of Graylion. Four days later, Schoemaker loaned respondent $6,000. The equity interest in respondent's capital account at his former law firm, which respondent believed to be in excess of this amount, was pledged as collateral. At respondent's request, Schoemaker forwarded $5,000 directly to respondent's newly retained attorneys to cover the retainer and gave respondent the remaining $1,000.

Davis remained respondent's client, and respondent continued to provide legal services to Davis and CIED throughout 1981. When it became clear that the gold mining venture was doomed, respondent instituted suit against Davis to obtain legal fees. On February 16, 1982, he obtained a default judgment in the amount of approximately $60,000. The court permitted Davis to reopen this suit only after the judgment was secured by the mineral rights to the property in question and the Anchorage, Alaska, home of Davis' husband. This reinstituted suit, however, also resulted in a default judgment for approximately $60,000.

In August 1982, respondent sold his judgment, now secured by the mineral rights and the Anchorage, Alaska, house, to an Alaskan concern for $75,000. Respondent received $60,000, and

$15,000 went directly to the Alaskan attorneys involved in the transaction. Respondent never informed Schoemaker that he had either obtained the judgment or subsequently sold that judgment.

In the meantime Davis defaulted on the second installment due on her $100,000 indebtedness to Schoemaker. Rather than institute suit against Davis, however, Schoemaker attempted to negotiate with her. He alleged that in April 1982 he agreed to forebear legal action against Davis for three years in return for a $200,000 rather than a $100,000 repayment. The two also signed a finders' fee agreement. Respondent was not present at the April meeting and claimed no knowledge of the agreement. Schoemaker claimed he entered into the agreement with respondent's express knowledge and with their oral understanding that respondent would pursue Davis by filing suit, while Schoemaker would use less drastic measures to pressure repayment. Schoemaker alleged further that respondent orally agreed to pay the 50% guarantee of the $100,000 Schoemaker-to-Davis loan, as soon as he collected on any judgment he might obtain against Davis.

Schoemaker testified it was not until May 1983 that he learned directly from an Alaskan attorney that not only had respondent obtained judgment against Davis but had also sold the judgment and obtained $60,000 in cash. When he confronted respondent and demanded $50,000, respondent refused. Respondent testified his refusal was based on the fact that there had never been a default on the $100,000 note, inasmuch as the due date had been extended by the April 1982 agreement between Schoemaker and Davis.

Both parties agreed respondent repaid only $1,000 on his $6,000 indebtedness to Schoemaker. Respondent testified, however, that he and Schoemaker had orally agreed respondent would offset this indebtedness by his services to International Assets Management (IAM), the successor corporation to Graylion. Schoemaker denied any such agreement.

Schoemaker complained to the ethics authorities. After hearing, the committee concluded respondent was guilty of unethical conduct by failing to discharge his obligations under the documents that he had executed. Furthermore, his simultaneous representation of Davis, Schoemaker and himself in the same transactions created an actual conflict of interest. His actions adversely reflected on his fitness to practice law. Accordingly, the committee found respondent to be in violation of DR 1–102(A)(3), (4), (5) and (6), DR 5–104, DR 5–105 and DR 5–106.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board concurs that the evidence clearly and convincingly establishes respondent engaged in unethical conduct in both of the underlying matters. Accordingly, based upon the totality of the circumstances, the Board recommends respondent be publicly reprimanded.

Initially, the evidence does not clearly and convincingly establish respondent had a contingent fee agreement with the Appelbaums in the malpractice action. *In re Shaw,* 88 *N.J.* 433, 437 (1982); *In re Sears,* 71 *N.J.* 175, 197 (1976); *In re Rockoff,* 66 *N.J.* 394, 396–397 (1975); *In re Pennica,* 36 *N.J.* 401, 419 (1962). Nor is there proof by clear and convincing evidence that there was a contract of employment between the Appelbaums and respondent concerning an alleged injury sustained by Sabina Appelbaum as a result of a fall in a supermarket. *In re Shaw, supra,* 88 *N.J.* at 437; *In re Sears, supra,* 71 *N.J.* at 197; *In re Rockoff, supra,* 66 *N.J.* at 396–397; *In re Pennica, supra,* 36 *N.J.* at 419.

On the other hand, the evidence does disclose that respondent entered into a contract of employment with the Appelbaums to prosecute a malpractice action. Thereafter, he not only failed to follow through on the matter, but also affirmatively misrep-

resented the status of the matter to the clients. He thereby disregarded his obligation to his clients. *Matter of Smith,* 101 *N.J.* 568, 572 (1986). Respondent's claim that the matter was forwarded to another attorney in his firm, who neglected it, is not corroborated by any documentary evidence. In any event, respondent had a duty to ensure the matter progressed smoothly. *See Matter of Schwartz,* 99 *N.J.* 510, 518 (1985). His neglect to keep his clients accurately informed diminishes the confidence the public should be able to have in their attorney. *See Matter of Stein,* 97 *N.J.* 550, 563 (1984).

Furthermore, once respondent learned the case had not been instituted, he neglected his responsibility to seek adequate and appropriate relief for his clients. Although the Statute of Limitations had not yet run, respondent failed to research the law or consult another attorney knowledgeable in that particular area of law. Ignorance of the law does not diminish respondent's responsibility. *Id.* at 565. As a result of respondent's inaction, the Appelbaums eventually lost their cause of action for failure to prosecute within time. The Board concludes respondent was grossly negligent and in violation of *DR* 6-101.

Nonetheless, in the end the Appelbaums were compensated. There was, therefore, no true injury to them. Thus, if respondent's behavior had been this single act of misconduct, his actions would not warrant more than a private reprimand, particularly when viewed in conjunction with both respondent's and his wife's serious medical problems. However, when this negligence is combined with respondent's actions vis-a-vis Davis, Schoemaker and the CIED gold mining venture, a more severe sanction is mandated.

Almost from the outset of his acquaintance with Schoemaker and Davis, but assuredly by January 1981, respondent was personally involved in the CIED gold mining venture. Moreover, by early 1981, respondent's law firm had withdrawn from

representing Schoemaker. Respondent, on the other hand, not only continued to represent Davis and CIED, but also simultaneously became a business associate of Schoemaker, when he accepted first a directorship and next a vice presidency and the office of chief executive. He personally guaranteed 50% of Schoemaker's $100,000 loan to Davis. He prepared all requisite legal documents to effectuate not only that loan, but also the initial loan to Schoemaker himself. Respondent would have been wiser to avoid entanglements of his personal business concerns with his professional relationships. *In re Surgent*, 79 *N.J.* 529, 532 (1979).

Under these circumstances, respondent was unable to render objective advice and undivided loyalty to either Davis or Schoemaker. *In re Wolk*, 82 *N.J.* 326, 333 (1980). *See In re Ryan*, 66 *N.J.* 147, 150 (1974). His judgment was clouded by self-interest. *See Matter of Reiss*, 101 *N.J.* 475, 487 (1986). As an attorney, respondent is bound by more rigid rules in his business ventures than ordinary business persons. *In re Carlsen*, 17 *N.J.* 338, 347 (1955). *See In re Barrett*, 88 *N.J.* 450, 452–453 (1982). Respondent therefore had "a duty to explain carefully, clearly and cogently why independent legal advice" was required. *In re Wolk, supra*, 82 *N.J.* at 333. *Accord Matter of Reiss, supra*, 101 *N.J.* at 487; *Matter of Miller*, 100 *N.J.* 537, 543 (1985); *In re Gallop*, 85 *N.J.* 317, 321 (1981); *In re Kamp*, 40 *N.J.* 588, 595 (1963). He should have made a full disclosure of his personal interests in the matter to both Davis and Schoemaker as well as explain the potential conflicts of interest. The Board finds that respondent failed to meet these obligations and thereby violated *DR* 5–104. *See Matter of Reiss, supra*, 101 *N.J.* at 487.

Furthermore, respondent's preparation of all requisite documents to effectuate both loans in February 1981, including the second mortgage on Schoemaker's personal residence, supports a conclusion that respondent was also representing Schoemaker

in his capacity as an attorney. Even if respondent had not been personally involved in the gold mining venture and Schoemaker's business, he was still in a position that might render him incapable of giving undivided loyalty or objective advice to either client. *In re Wolk, supra,* 82 *N.J.* at 333. Thus, he should have secured the informed, express and uncoerced consent of both Davis and Schoemaker. *See In re Rockoff, supra,* 66 *N.J.* at 396; *In re Lanza,* 65 *N.J.* 347, 351 (1974); *In re Kamp, supra,* 40 *N.J.* at 588. The Board finds respondent's failure to withdraw representation from one client, when withdrawal was clearly necessitated by the circumstances, violated *DR* 5-105 and *DR* 5-106.

Finally, the Board is convinced the evidence clearly and convincingly demonstrates that respondent failed to abide by the instruments that he executed. Respondent repaid only $1,000 of the $6,000 promissory note to Schoemaker. Moreover, in order to effectuate the $100,000 loan from Schoemaker to Davis, which would hopefully undergird his efforts to profit from the gold mining venture, respondent personally guaranteed 50% of any losses upon default. Whether he subsequently agreed to pay $50,000 out of the proceeds collected from a judgment obtained against Davis is immaterial. The fact is that respondent never made good on his initial guarantee. Had there been any further agreements concerning either indebtedness, they too should have been in written form. No such evidence was forthcoming. As an attorney, respondent is held to an even higher standard than an ordinary business person in his business ventures. *In re Carlsen, supra,* 17 *N.J.* at 347. *See Matter of Reiss, supra,* 101 *N.J.* at 488. Respondent simply failed to abide by those high standards. Such unprofessionalism cannot be countenanced.

The Board concludes that respondent engaged in misrepresentation and that his actions were prejudicial to the administration of justice. His derelictions and misconduct adversely

reflected on his fitness to practice law. Hence, the Board concludes respondent violated *DR* 1-102(A)(4), (5) and (6).

Nonetheless, the purpose of disciplinary proceedings is not the punishment of the offender, but protection of public against an errant attorney. *Matter of Pauk*, 107 *N.J.* 295, 305 (1987); *Matter of Getchius*, 88 *N.J.* 269, 276 (1982). Mitigating factors are relevant. *In re Infinito*, 94 *N.J.* 50, 57 (1983). Respondent has had a history of severe heart ailments since the early 1970's. The additional stress created by his wife's serious and continuing medical problems exacerbated his own physical disability. Additionally, respondent has had no prior disciplinary infractions sustained against him. Finally, respondent has been voluntarily retired from the practice of law since 1986. According, the Board finds that the totality of the circumstances, *In re Nigohosian*, 88 *N.J.* 308, 315 (1982), warrants the imposition of a public reprimand.

The Board further recommends respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.