IN THE MATTER OF HILTON L. STEIN, AN
ATTORNEY AT LAW.

November 5, 1984.

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that HILTON L. STEIN of MONROE, NEW YORK be suspended from the practice of law for a period of six months, and good cause appearing;

It is ORDERED that the report of the Disciplinary Review Board is hereby adopted and that HILTON L. STEIN is sus-

pended from the practice of law for a period of six months, effective immediately; and it is further

ORDERED that, prior to restoration, respondent shall demonstrate satisfactory proof of his medical and psychiatric capability to practice law; and it is further

ORDERED that HILTON L. STEIN be and hereby is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that HILTON L. STEIN reimburse the Office of Attorney Ethics for appropriate administrative costs; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 5th day of November, 1984.

### APPENDIX

This matter is before the Board based upon three presentments filed by the District X Ethics Committee and one recommendation for private reprimand filed by the District XII Ethics Ethics Committee which were consolidated for hearing before the Board.

The presentments charge Respondent with a pattern of neglect in representing various clients and improper withdrawal of trust funds. Respondent was additionally charged with failing to inform a municipal court judge of a civil settlement during a request to withdraw criminal charges. These charges of misconduct are summarized as follows.

### 1. ESSING COMPLAINT

Raymond Essing first consulted with Respondent in April 1979 about a codicil to his wife's will and certain corporate documents pertaining to distribution of shares in the family

business. When Essing's stepdaughter demanded that he vacate the business premises after his wife died in late May 1979, Essing again consulted Respondent. Essing was concerned about his rights to business assets and potential problems with his share of his wife's estate.

Essing was unable to pay an hourly rate for legal services to be performed by Respondent. Consequently, they entered into a retainer agreement whereby $2,500 was advanced to Respondent and a contingent fee of 25 per cent of any net recovery from the estate and/or his wife's progeny was to be paid to Respondent's firm.

On Essing's behalf, Respondent filed a verified complaint, an order to show cause and supporting documents. Respondent assigned the estate matter, including an inventory of various assets, to John A. Paparazzo, Esq., an associate in his office who had been admitted to the Bar in 1977. Paparazzo, at the time, did not specialize in any aspect of law; he performed work Respondent assigned to him.

Essing frequently visited Respondent's office to deliver documents or to learn the status of the proceedings. However, as the litigation progressed through the balance of 1979 and 1980, Respondent was less and less frequently in his office during normal business hours. His absences were attributable to physical maladies aggravated by drug addiction to amphetamines and cocaine.

Paparazzo and another associate in the office began to handle more tasks in the Essing litigation. Respondent attended depositions, but associates handled settlement negotiations. Respondent did endeavor to keep informed concerning the status of this file and worked with Paparazzo on the litigation matter. When Essing learned of Paparazzo's substantial involvement on the case, he unequivocally told Respondent, both before and after settlement negotiations began, that he had retained Respondent and not someone else in the office to handle the file.

Respondent, nevertheless, continued to have Paparazzo work on the file.

Respondent's associates reached a settlement figure of $8,500 with counsel for defendants and the case was marked settled before the court. The case was marked dismissed in March 1981. Respondent was not certain if he knew of the settlement at that time but regularly checked with Paparazzo as to the status of the case. Essing, on the other hand, had not been informed of the settlement terms or the effect the settlement would have on his financial condition. The $8,500 settlement amount was unacceptable to him. He complained to the Respondent when he learned that the case had been marked settled and dismissed. A motion to vacate the dismissal and restore the matter to the trial calendar filed by Respondent was denied in late July 1981. After Essing was informed of this by Respondent, Essing sought new counsel. The new counsel then filed an appeal of the dismissal which was unsuccessful. Respondent did not submit to Essing a statement accounting for legal services rendered, nor did he return any part of the retainer he had received.

The panel concluded that Respondent failed to keep Essing reasonably informed of material developments in the case and thus violated *DR* 7–101(A). The disclaimer by Respondent that he was not directly involved in the settlement negotiations did not diminish his responsibility. Respondent knew that Essing wanted him to control the efforts made on his behalf. The panel found that Respondent either should have been involved in the settlement negotiations himself, or should have established an office procedure, under his supervision, to inform the client promptly of the status of the case.

The panel further found that Respondent's problems with drug addiction during this period significantly impaired the operation and efficiency of his office. While the panel was sensitive to Respondent's maladies and obvious mental distress, it held that his physical and mental condition made his conduct

no less professional, warranting public discipline. Finding the same failure to account in this case as it had in the Blois matter, *infra*, the panel recommended the identical sanction—censure more severe than a private reprimand.

## 2. BLOIS COMPLAINT

Respondent was retained in December 1981 by Judith A. Blois to represent her in a matrimonial matter which required immediate action. Upon Respondent's advice, Mrs. Blois withdrew $2,500, representing one-half of the total amount in a joint bank account she maintained with her husband, and gave the money to Respondent to hold. Respondent believed the money was to be used for child support during the pendency of the ensuing divorce litigation and for payment of his legal fees. Mrs. Blois, however, believed that the money was to be held until the marital assets were divided. She did acknowledge that there had been a discussion with Respondent about a $500 retainer and a $100 hourly rate for services rendered. Respondent placed $500 of the total in his personal or business account with the $2,000 balance deposited in a trust account.

Mrs. Blois and her husband had essentially agreed not to contest the divorce. Mrs. Blois instructed Respondent to obtain reasonable child support from her husband and to exchange her interest in a music store, which her husband operated, for his interest in the marital home and one of the family cars. Respondent, however, advised her that the exchange of interests in the store and home was unwise without an evaluation of the business.

Respondent performed various legal services for Mrs. Blois during the month of December 1981. He reviewed her 58 pages of notes to prepare a draft complaint and order to show cause which Respondent intended to use as negotiating tools. This draft complaint was reviewed and revised by Mrs. Blois.

A four-way conference was conducted among Mrs. Blois, Respondent, her husband and his attorney. Respondent sought

additional information from Mrs. Blois' attorney regarding Mr. Blois' income. During this time, Respondent and Mrs. Blois were in frequent telephone contact. These discussions revealed that there was little equity in the marital home which Respondent felt made the exchange of interests in the home and store detrimental to his client's interests.

Mrs. Blois became upset with Respondent's representation in January 1982 when she learned of the hours spent and the fees charged. Respondent unsuccessfully attempted to have another attorney associated with him continue the case at a lower billing rate. Mrs. Blois demanded an itemized statement of services. When she made an appointment with Respondent to review the itemization and discuss the services listed, Respondent was not there. However, Respondent's secretary sought to obtain Mrs. Blois' signature on a typed retainer agreement which she refused to sign.

Mrs. Blois then retained new counsel. With her father, a state trooper, accompanying her, she went to Respondent's office to obtain her file in early February 1982. Two days before this meeting to terminate his services, Respondent without notice to his client withdrew $700 from the monies on deposit in the trust account. At the conference, Respondent submitted to Mrs. Blois a statement of charges for $1,700 and advised that he would remit the $800 balance to her. Respondent neither turned over to Mrs. Blois the file nor a check to Mrs. Blois for $800 because Respondent maintained that he needed more time to reproduce the file and to prepare a check for $40 to reimburse her for a mistake in billing for legal services.

Mrs. Blois immediately filed an informal ethics complaint against Respondent on February 8, 1982. When an investigator from the Committee requested Respondent to surrender the file to Mrs. Blois, he replied that it had been mailed a day or so before.

The panel found no unethical conduct under *DR* 7–101(A)(2) concerning Respondent's representation of Mrs. Blois, or from his alleged failure to turn over her file upon demand. The panel noted that:

> We are convinced that the focus of this ethics complaint is not on any supposed hesitancy of Respondent to represent the interests of complainant in other than a zealous or effective manner; rather, it focuses upon her utter surprise at the time expended by Respondent and the manner in which he took his fee from the trust account.

The panel held that Respondent's action regarding the taking of his fee from the trust account was "an egregious disregard of his responsibilities under *DR* 9–102(A)(2) and related provisions." Holding that an attorney may not unilaterally, without notice to the client, reimburse to himself fees from a trust account, the panel concluded that Respondent was guilty of unethical conduct in that he failed to account to his client before substantially depleting the $2,000 in the trust account. The panel was disturbed by Respondent's withdrawal of $700 two days before his last meeting with Mrs. Blois. While Respondent acknowledged his error to the panel, the panel found that his actions were improper and unethical. It concluded that Respondent's conduct merited censure more severe than a private reprimand.

### 3. KAFKA COMPLAINT

Respondent was retained on October 9, 1980 by Stephen Kafka, an overseas airline pilot for Flying Tigers Airline, to defend him against a simple assault complaint filed in the Kinnelon Borough Municipal Court. Due to Kafka's occupation, he was frequently out of the United States during most of any month. He had informed Respondent that he would be available for an October 28, 1980 hearing. However, a day or two before the hearing date, mechanical difficulties with an airplane made it impossible for him to return to this country for the hearing. He advised Respondent's office of this, and a new date of November 10 was scheduled by the court.

Kafka and his 11-year-old son, a witness to the alleged assault, met with Respondent in the late afternoon or early evening of November 10 to discuss their testimony and trial strategy. They agreed to meet in the Municipal Court at 8 p.m. that evening. While the Kafkas arrived in time, Respondent did not. Unsuccessfully, Kafka attempted to contact Respondent by telephone. Respondent finally appeared at 9:45 p.m. or 10 p.m., explaining that he had been ill and could not try the case that evening. The case was adjourned. Respondent's illness was attributed to stomach problems aggravated by his drug addiction.

A dispute concerning fees due Respondent then developed. Kafka and Respondent exchanged correspondence during December. Respondent had written, but not mailed, a sharp response to Kafka's somewhat stinging letter of December 17. In his unmailed letter, Respondent informed Kafka that he should seek new counsel immediately. Respondent had not mailed this letter because of its tone. Respondent, unsure whether he should continue to represent Kafka because of Kafka's questioning of the fees, nevertheless continued to represent him. A new hearing date in mid-January was scheduled. By that time, Respondent had resolved to withdraw as counsel, but failed to advise Kafka of this decision. Counsel for the complainant, however, had been advised. The case was again rescheduled, now to January 27, 1981, to accommodate Respondent's decision to withdraw from the case. Respondent was informed by opposing counsel that he would not consent to any future adjournments. Kafka was not advised of opposing counsel's position. By letter dated January 23, Kafka was informed by Respondent of the January 27 hearing date. The letter made a cursory reference to Respondent's intent to withdraw as counsel.

The trial was adjourned until February 11, 1981. A few days before this trial date, Kafka received papers in support of Respondent's motion to withdraw. The papers were signed by Paparazzo and not Respondent. Respondent had apparently

suffered recurrences of his illness throughout the holiday season and into January 1981. At the urging of his wife and parents, Respondent took an unplanned vacation in late January and early February, during which time the motion papers were prepared. Respondent had returned from vacation and was in the office by February 11, but did not argue the motion; an associate did. The motion was granted.

Kafka retained new counsel. The Municipal Court hearing was rescheduled again by the Municipal Court Judge who had perhaps been inadvertently prejudiced by inaccuracies contained in the affidavit in support of the motion to withdraw. Kafka was convicted of the offense.

The panel held that the manner in which Respondent sought to withdraw from the case violated DR 2–110(A)(2). No due notice to withdraw had been given to Kafka. While opposing counsel knew of Respondent's intent to withdraw in early or mid-January, Kafka was not so informed. The panel found that Kafka:

> ... was lulled into a false sense of security until a few days before the scheduled January 27 hearing when a two-sentence letter advised him that, at the hearing, an application to be relieved as counsel would be made.

The panel found that neither the supporting affidavit nor any cover letter with the motion papers advised Kafka to seek other counsel immediately. It also concluded that a "perfunctory and grossly imprecise affidavit" was filed to accommodate Respondent's vacation plans. "It gave the Municipal Court Judge a mistaken impression of the client's character."

The panel found that Respondent's last minute motion to withdraw prejudiced his client who was not given adequate notice and was caused to pay additional counsel fees. The panel did not find that the factual errors in the affidavit were intentionally inserted, the Kafka file being one of many which were handled by his office during his unplanned vacation.

The panel held that Respondent violated *DR* 2–110(A)(2) and *DR* 7–101(A) and that he should receive discipline more severe than a private reprimand.

The panel added that it became evident that some of Respondent's actions or omissions could have been indirectly related to his physical maladies and accompanying drug addiction.

### 4. CHAPMAN COMPLAINT

Respondent had been retained to represent Edward Edlkraut, who had been named a defendant in a complaint signed by Anita Chapman on March 26, 1981 charging him with criminal sexual contact, contrary to *N.J.S.A.* 2C:14–3b.

A probable cause hearing commenced on April 2, 1981 was not concluded due to the emotional state of the victim/complainant. Respondent advised the victim/complainant to obtain an attorney to represent her and to have this attorney contact him. After this hearing, Respondent again advised her to retain an attorney to discuss with him a possible civil settlement of the case. He indicated to her that the defendant would not be convicted and suggested that there could be additional hearings before a grand jury and other proceedings. He suggested the names of several attorneys to her.

Ms. Chapman hired one of the attorneys recommended and later met with him in his office. During most of the conference between the two, the attorney's partner, who was a Municipal Court Judge in Morris County, was present. Ms. Chapman related to this attorney her conversation with Respondent and that she wished to withdraw the criminal complaint because she wanted to move to Texas to reside with her father and obtain employment there.

Her attorney advised Ms. Chapman to obtain a release from Edlkraut because of the potential for a malicious prosecution charge if she simply dropped her complaint. He also discussed with her the possibility of a civil settlement, and it was agreed that he would make a demand for $5,000.

When Chapman's attorney informed Respondent of the $5,000 demand for civil settlement, Respondent made a counter-offer of $1,500. After conferring with his client, this counterof-fer was accepted. On April 8 or 9, 1981, $1500 in cash plus releases were delivered to Chapman's attorney by Respondent with a covering letter which instructed that the release docu-ments should be held "in escrow pending the representations by the complainant on Thursday evening, April 9, 1981 in the Jefferson Municipal Court" (Exhibit A). Chapman's counsel deposited $1,100 in his firm's trust account (Ms. Chapman's share) and $400 in his firm's operating account (the legal fee for representation).

At the ethics hearing, Ms. Chapman testified that she had been counseled by both the Respondent and her attorney not to disclose the civil settlement at the municipal court hearing. This was categorically denied by both attorneys. It is acknowl-edged, however, that she received no affirmative instruction to advise the Municipal Court of the civil settlement. When the probable cause hearing continued on April 9, 1981, Ms. Chap-man appeared by herself. She informed the court that she wished to withdraw the criminal complaint. Although she gave reasons for this withdrawal, she did not mention the civil settlement. Respondent who was present at this time repre-senting defendant, Edlkraut, also did not disclose to the court the civil settlement. The Municipal Court dismissed the charge subject to the approval of the County Prosecutor, which was necessary because this was an indictable offense.

Later that same evening, Ms. Chapman and her attorney met with Respondent at his office. The prompt meeting was ar-ranged so that the civil matter could be concluded before Ms. Chapman's imminent departure to Texas. At that meeting, releases dated April 8, 1981 were executed and Ms. Chapman signed a memorandum which stated that the money settlement was being paid for the civil claim and not as payment for withdrawing the criminal charges. The release signed by Ms. Chapman, however, specifically stated that:

Releasor hereby waives all rights and claims, both civil *and criminal* against Releasee (emphasis supplied).

At this meeting, Ms. Chapman received a trustee check from her attorney for $1,100.

The existence of the civil settlement was apparently discovered by the Morris County Prosecutor's Office during its ancillary investigation of the criminal matter in the course of its review of the request to dismiss.

The criminal charges against Edlkraut were downgraded to simple assault, of which he was ultimately found guilty.

A formal complaint was filed against Respondent charging him with violating *DR* 1–102(A)(4), (5) and (6) for failing to disclose to the Municipal Court the civil settlement during the request to withdraw the criminal charge.

The panel held that Respondent, who was present in Municipal Court on April 9, 1981, had a duty to disclose to the court the full details of the settlement. His failure to do so violated *In re Friedland,* 59 *N.J.* 209 (1971) and *DR* 1–102(A)(5) and (6).

The panel accepted Respondent's testimony that he was not aware of the *Friedland* case and found that the factual circumstances in this case were not as serious as those in *Friedland.* The District XII Ethics Committee panel, unaware of the Respondent's other ethical violations, recommended that a private reprimand be imposed.

Respondent no longer practices law; he is a claims examiner for a New York insurance company.

## CONCLUSIONS AND RECOMMENDATIONS

■ Upon a review of the full record, the Board is satisfied that the conclusions of the two Committees in finding unethical conduct on the part of Respondent are fully supported by clear and convincing evidence.

In the Essing matter, the Board concludes that Respondent violated *DR* 7–101(A) by failing to keep Essing reasonably informed of material developments in his legal matters.

■■ In his relations with a client, an attorney is bound to the highest degree of fidelity and good faith. *Matter of Nichols*, 95 *N.J.* 126, 131 (1984). An attorney must keep his client completely and accurately informed of his legal matters. See generally *In re Palmieri*, 75 *N.J.* 488, 489 (1978), *In re Loring*, 62 *N.J.* 336, 347–348 (1973). Clearly, a failure of communication by an attorney with his client diminishes the confidence the public should expect from a member of the Bar.

In the Blois matter, Respondent's continued failure to keep his client adequately informed was a part of the basis for the complaint here. However, of greater concern, is the manner in which he took his fee from the client's trust account. No formal retainer agreement had been entered into between Respondent and Mrs. Blois. In early January 1982, Mrs. Blois demanded an itemized statement of services. Respondent, knowing of her dissatisfaction with his service, nevertheless withdrew $700 from his trust account two days before he met with her concerning this itemization of services.

*DR* 9–102(A)(2) governing client trust monies provides that:

Funds belonging in part to a client, a portion of which the lawyer or law firm will be entitled to receive for his own use must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due *unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.* (Emphasis supplied.)

■ In relevant part, this New Jersey provision is identical to that of the State of Wisconsin. There, the court held that before an attorney could unilaterally withdraw funds from a client's trust account, an agreement must have been reached between the attorney and the client on at least three points: (1) the right of the attorney to have the client pay these fees; (2) the amount to which the attorney is entitled; and (3) the time at which payment will be expected.

"Absent an agreement as to these matters, it is difficult to see how any reasonably prudent attorney could assume that part of his client's trust funds could legally be withdrawn, because the requirement that they be withdrawn only in the absence of a dispute clearly assumes that the client has at least been advised as to these matters." *In the Matter of Marine*, 82 *Wis.*2d 602, 264 *N.W.*2d 285, 288–289 (Sup.Ct.1978).

By withdrawing the funds from the client's trust account and not giving the client prior notice, Respondent violated *DR* 9–102(A)(2). A client must be given notice before a fee can be taken from his account.

In the Kafka matter, the Board concludes that Respondent's actions in withdrawing as counsel clearly violated *DR* 2–110(A)(2). His failure to give adequate notice to his client did not allow his client sufficient time to engage other counsel. In fact, Respondent had not even advised his client to seek other counsel immediately. The manner in which Respondent withdrew from this case may well have prejudiced the rights of his client before the court because the supporting affidavit gave a mistaken impression of the client's character. In addition, the client was required to undergo additional expense and effort because of Respondent's action which violated *DR* 2–110(A)(2) and *DR* 7–101(A).

In the Chapman matter, the Board concludes that Respondent violated *In re Friedland*, 59 *N.J.* 209 (1971) by failing to inform the Municipal Court Judge that there was a civil settlement between the victim and defendant. The Court in *Friedland* held that if an attorney wished to have complaints dismissed involving his client, he must first go before the prosecutor and the judge and make a full and open disclosure of the nature of the charges and terms, if any, under which the dismissal was sought. A dismissal must not be consented to unless both the judge and the prosecutor are satisfied that the public interest as well as the private interests of the complainant will be protected. *Id.* at 220. This failure to disclose also violates *DR* 1–102(A)(5) and (6) in that Respondent engaged in conduct that was prejudicial to the administration of justice and adversely reflected upon his fitness to practice law.

 From a review of the record, it is clear that Respondent did not specifically advise Ms. Chapman to inform the Municipal Court of the civil settlement. Ms. Chapman appeared in Municipal Court and advised that court of her other reasons to withdraw the criminal complaint. She did not mention the civil settlement, nor did the Respondent who was present in the court room. The testimony is in conflict as to whether Respondent deliberately counselled the victim to conceal the money settlement. Regardless of who is telling the truth, Respondent had an affirmative obligation to disclose to the court the existence of a civil settlement. His failure to do so lends credence to the victim's testimony that she was instructed not to disclose the settlement. "In some situations, silence can be no less a misrepresentation than words." *Crispin et al. v. Volkswagen Werk, et al.,* 96 *N.J.* 336 (1984). Attorneys have always had, where the interests of justice so require, a continuing duty to disclose all pertinent and relevant facts to the court so that it may act fairly. *In re Turner,* 83 *N.J.* 536, 539 (1980). See also *In re Nigohosian,* 88 *N.J.* 308, 314 (1982).

 While Respondent maintained that he was not familiar with the *Friedland, supra,* case, ignorance of the ethical rules and case law cannot be permitted to diminish the responsibility of attorneys for conduct in violation of these rules. *Matter of Eisenberg,* 75 *N.J.* 454, 456–457 n. 1 (1978). His position here as counsel for the criminal defendant who paid money to the victim is clearly analogous to the *Friedland* scenario. Friedland was suspended for six months. Allowing that Respondent was ignorant of the warning in *Friedland,* the Board cannot accept the premise that any reasonably prudent attorney could fail to recognize the pertinency of a civil settlement to the underlying criminal case.

 Offered in mitigation of Respondent's conduct is the fact that he was addicted to controlled dangerous substances, cocaine and amphetamines. That defendant was a drug addict at the time cannot be considered a mitigating factor. If anything,

it should be considered an aggravating factor because this Respondent, while a member of the Bar, committed a crime by the illegal acquisition of controlled dangerous substances. Many crimes arise out of drug and alcohol use. The situation, while regrettable, is not rare. *State v. Roth*, 95 *N.J.* 334, 368 (1984).

■ What, perhaps, may be considered as a mitigating factor is that Respondent had not committed criminal acts regarding his representation of these clients. Another could be that he no longer practices law; he is presently a claims examiner in New York.

Respondent's conduct in Essing, Blois and Kafka exhibited a "pattern of neglect in his handling of legal matters." *DR* 6–101(A)(2). The public must be protected from this kind of unprofessionalism. *In re Palmieri*, 75 *N.J.* 488, 489 (1978). A graver concern to the Board is Respondent's conduct in the Chapman matter. Respondent negotiated a money settlement on behalf of his client which was specifically conditioned upon "the representation by the complainant" in the underlying criminal proceedings. He failed to disclose to the court facts of obvious relevance. His actions were deliberate. Ignorance of case precedent cannot excuse clearly improper behavior.

■ Therefore, the Board recommends that Respondent be suspended from the practice of law for six (6) months. Being concerned about the usage of illegal drugs by Respondent, the Board further recommends that prior to his readmission, Respondent be required to present medical and psychiatric evidence of his capability of returning to the practice of law. *In re Goldstaub*, 90 *N.J.* 1 (1982).

The Board also recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.