577 A.2d 511

IN THE MATTER OF MARC J. TERNER, AN
ATTORNEY-AT-LAW.

Argued February 13, 1990—Decided August 8, 1990.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Peter R. Willis, Jr.,* argued the cause for respondent.

PER CURIAM.

This disciplinary action is based on numerous complaints from thirteen clients charging respondent, Marc J. Terner, with gross negligence, *RPC* 1.1(a); failure to act with reasonable diligence, *RPC* 1.3; failure to communicate with clients, *RPC* 1.4; conflicts of interest, *RPC* 1.7 and 1.8; and misleading communications regarding his services, *RPC* 7.1. Three additional complaints alleged a pattern of neglect, lack of diligence, and unprofessional conduct over a prolonged period. *RPC* 1.1(b). In addition, an audit of respondent's books and records by the Office of Attorney Ethics led to a charge of numerous recordkeeping improprieties, *R.* 1:21–6, but not of the misappropriation of funds.

By order of this Court, retired Judge Paul R. Huot was assigned as a special master to hear the case for the District XI Ethics Committee. After ten days of hearings, the Special Master found that respondent had committed numerous ethical violations, and recommended three private reprimands, three public reprimands, and a forty-eight-month suspension from the practice of law. The Special Master also recommended as a condition of reinstatement that respondent submit to drug tests twice a week during the period of suspension and for two years following his reinstatement.

The Disciplinary Review Board (the DRB or Board) agreed that respondent had committed the alleged violations, and recommended that he be suspended from the practice of law for three years. In addition, the Board recommended that before reinstatement, respondent be required to provide proof that he has not used drugs during the period of suspension, that he is competent to practice law, and that he has satisfactorily completed the Skills and Methods courses offered by the Institute for Continuing Legal Education. We agree.

As summarized by the DRB, the relevant facts are:

708

## THE RYKOWSKI MATTER

Respondent represented two individuals in the purchase of real estate located in Sandyston, New Jersey, from grievants, Paul and Deborah Rykowski. At the closing on August 22, 1985, respondent held in escrow $2,100, in behalf of grievants, to cover certain costs. Respondent also undertook the obligation of paying off grievants' mortgage and, at the time of closing, obtained a payoff figure from their attorney in the amount of $33,898.49, representing the balance due as of July 1, 1985. Respondent withheld $33,898.49 from the sale proceeds and forwarded that amount to the mortgagee. The mortgagee, however, returned the check to respondent because of the failure to include the additional interest computed from July 1, 1985. Grievants' attorney requested that respondent pay the interest out of the escrow funds. Respondent did not comply with this request and ignored that attorney's subsequent requests for information.

On February 24, 1986, respondent resubmitted the original payoff amount, despite his knowledge that it was insufficient. Respondent's check for $33,-898.49 was again returned to him.

The Special Master concluded that respondent acted with gross negligence, contrary to *RPC* 1.1(a), and failed to act with reasonable diligence, contrary to *RPC* 1.3. The Special Master also concluded that respondent violated *RPC* 1.4 because "the record fails to demonstrate that [respondent's] clients ... were ever made aware of their precarious position...." The Special Master recommended a six-month suspension for respondent's unethical conduct in this matter.

## THE ROTHWELL MATTER

Respondent represented grievants, Fred and Beatrice Rothwell, in the sale of their home in Pompton Lakes, New Jersey. At the time of the closing on October 4, 1984, $2,300 of grievants' funds were placed in escrow with the purchaser's attorney. These funds were escrowed pending receipt of proof of cancellation of a small mortgage that originated in 1965 and remained open of record.

Several months after the closing, grievants became concerned about the status of the open mortgage and contacted an attorney in Florida, where they were then residing. The Florida attorney wrote to respondent on July 11, 1985, reminding respondent that he had repeatedly promised that grievants would receive the balance of the escrow funds. The attorney also noted his inability to contact respondent about the status of the matter.

On March 4, 1986, respondent wrote to the Florida attorney reporting that his attempts to obtain the mortgagee's address from the Secretary of the State of New Jersey were unsuccessful. On June 30, 1986, respondent again wrote to the Florida attorney and enclosed a proposed complaint and certification for execution by grievants. The Complaint sought a discharge of the mortgage by court order.

On July 16, 1986, the signed certification and other documents were returned to respondent. The complaint, however, was not filed until July 1987, one year later. At the time of the ethics hearing, there was no indication as to the disposition of this complaint.

Respondent finally communicated with the original mortgagee located in Paterson, New Jersey, and obtained a discharge on May 24, 1988. Thereafter, grievants received their escrowed $2,300, albeit nearly four years after the closing.

The Special Master, in recommending a six-month suspension for respondent's unethical conduct in this matter, concluded that "[t]he evidence clearly shows a lack of competence, a lack of diligence and a failure of communication in violation of *RPC* 1.1, 1.3 and 1.4."

### THE RUSS MATTER

In 1980, grievant, Dr. Leo Russ, retained respondent for collection of bills owed to his dental association. In the latter part of 1985, communication between respondent and grievant became difficult. Finally, in February 1986, grievant requested that respondent return all records to the dental association. Respondent had failed to communicate with grievant or his dental association from September 1985 to February 1986.

On March 10, 1986, respondent wrote to grievant and apologized for his delay in returning telephone calls. After some further unspecified delay, respondent finally returned the requested records to the dental firm.

The Special Master, in recommending a private reprimand, concluded that respondent had failed to adequately communicate with his client, in violation of *RPC* 1.4.

### THE PISCO MATTER

Grievant, Charles Pisco, retained respondent to represent him in three separate actions. In the first action, grievant retained respondent in 1982 or 1983 for assistance in withdrawing from a property owners' association. Grievant continued to pay association dues, which respondent deposited into his trust account. The owners' association subsequently executed against grievant's bank account. Respondent failed to appear in court to contest the execution, contrary to his promise to grievant.

At the time of the ethics hearing, grievant's payments were still being retained by respondent in his trust account. The Special Master concluded that respondent had failed to act with due diligence, contrary to *RPC* 1.3.

In the second action, respondent agreed to represent grievant and his wife in connection with an injury that grievant received at a Las Vegas, Nevada hotel. Respondent wrote two letters to the hotel in June 1986, but failed to pursue the matter further. He also failed to return grievant's telephone calls.

The Special Master concluded that respondent failed to adequately communicate with his client, contrary to *RPC* 1.4.

The third action involved grievant's dissatisfaction with work performed by a landscaper. Grievant contacted respondent but apparently did not enter into a fee arrangement with him.

At the ethics hearing, respondent testified that he advised grievant to pursue the case in Small Claims Court. The Special Master concluded that the evidence did not support a finding of unethical conduct by respondent in that matter.

Following his conclusion that respondent acted unethically in two of these three actions, the Special Master recommended that respondent be publicly reprimanded.

## THE TURAN MATTER

On May 2, 1985, respondent represented grievant, Selcuk Turan, and two other individuals in the purchase of a restaurant located in Bloomingdale, New Jersey. Respondent also represented the three parties in the creation of a business arrangement whereby they would own and operate the restaurant.

Shortly after the purchase of the restaurant, disagreements arose between the parties, who then sought to dissolve the business arrangement. Respondent subsequently prepared documents that referred to the business arrangement as both a partnership and a corporation.

On May 31, 1985, grievant and one of the other two parties signed a document prepared by respondent, whereby grievant agreed to assign his one-third interest in the partnership to the other parties, in exchange for $25,000. Three other documents were subsequently prepared by respondent reciting the release of grievant's interest in the corporation as well as his liabilities thereto. Grievant signed two of the documents on July 30, 1985. The transaction apparently was never completed because the signature[s] of the other parties were never obtained.

After consideration of conflicting testimony by grievant and respondent, the Special Master was satisfied that grievant was not in a position to give informed consent to this dual representation. The Special Master concluded that "with respect to [the dissolution of the] business interest, whatever it may have been, in May 1985 there was a breach of the Rule of Professional Conduct."

The remaining owners of the restaurant subsequently agreed to sell the property to four individuals (hereinafter "buyers"). Thereafter, respondent prepared a document entitled "Business Consultant, Management and Employment Agreement." The agreement provided, among other things, that grievant and another individual would be employees of the restaurant and that they would have an option to purchase the property upon the failure of the buyers to complete the purchase. The restaurant owners attempted to cancel the previous agreement because the buyers were unable to obtain a timely mortgage commitment. The buyers then instituted a civil action seeking a declaration that their contract was in full force and effect.

Grievant subsequently paid respondent $1,000 to represent the remaining restaurant owners in the lawsuit. It was in the interest of grievant and the other restaurant employee that the lawsuit be contested so that they could ultimately exercise their option to purchase the restaurant. Grievant and the other employee, however, were not parties to the civil action. The lawsuit was resolved by consent order.

The Special Master concluded that "the acceptance of funds for purpose of defense from a party not named in said lawsuit is a direct violation of the Rules of Professional Conduct."

Finally, the Special Master dismissed a grievance regarding respondent's representation of grievant, grievant's wife, and his mother-in-law, in connection with their purchase of real estate. The Special Master concluded that there was no satisfactory evidence that respondent improperly retained escrow monies held in connection with the real estate purchase.

The Special Master recommended that respondent be suspended from the practice of law for a period of six months for his unethical conduct in this matter.

*THE HOKE MATTER*

Grievant, James Hoke, retained respondent in June 1986 in connection with the purchase of a house. Grievant gave respondent $24,000 with instructions to hold the funds in an interest-bearing account until the closing. Ultimately, grievant did not purchase the property.

Grievant also retained respondent to form a corporation and to dissolve another. Grievant claimed that respondent failed to perform these services and that attempts to communicate with respondent were unsuccessful.

In a November 1986 letter to respondent, grievant requested the return of the $24,000. Finally, after a second letter from grievant in December 1986, respondent returned $21,701.01. Respondent did not provide an accounting for the balance of the retained escrow funds.

After review of conflicting testimony by grievant and respondent, the Special Master concluded that respondent failed to adequately communicate with his client, contrary to *RPC* 1.4. The allegations of respondent's failure to act diligently and competently were dismissed. The Special Master recommended that respondent receive a private reprimand for his unethical conduct in this matter.

*THE AZZALINA MATTER*

In January 1985, grievant, Gene Azzalina, paid respondent $300 to pursue a claim against a telephone company. Grievant wrote to respondent in April, May, and June 1986, requesting information regarding the status of his claim. Respondent finally advised grievant, in July 1986, that he was pursuing the matter against the telephone company. No action, however, was ever taken by respondent.

The Special Master, in recommending that respondent receive a three-month suspension for his conduct in this matter, concluded that respondent displayed a "total lack of diligence and a failure to communicate with his client," contrary to *RPC* 1.3 and 1.4.

*THE ELEFANTE MATTER*

In April 1984, grievants, Frank and Vivian Elefante, paid respondent $600 to pursue a claim against a development company that had allegedly damaged their nursery business during construction. In September 1984, respondent instituted a civil action against the development company. Respondent did nothing further to pursue grievants' claim.

In a separate matter, grievants' nursery was sued by a construction company regarding a dispute over the installation of a sewer line. Respondent filed an answer in June 1985, although it was dated September 7, 1984. Respondent

failed to subsequently defend grievant in the lawsuit and a default judgment was entered sometime in 1985.

In February 1986, grievants deposited $8,090 with the Clerk of the Superior Court without knowing that a judgment had already been entered against their nursery. All attempts by grievants to contact respondent regarding the status of their case were unsuccessful.

In a third matter, respondent was retained to represent grievants' son in connection with an altercation with another individual. Respondent was unable to serve the individual with the complaint and failed to advise grievants of the subsequent dismissal.

The Special Master, in recommending a six-month suspension in this matter, concluded that respondent was grossly negligent, contrary to *RPC* 1.1, failed to act diligently, contrary to *RPC* 1.3, and failed to communicate with his clients, contrary to *RPC* 1.4.

*THE HAYES MATTER*

In February 1985, grievant, Alvin Hayes, paid respondent $450 to dissolve a corporation. Grievant made several unsuccessful attempts to obtain either proof that the corporation had been dissolved by respondent, or the return of the $450 fee. On July 31, 1987, in a letter to respondent, grievant demanded the return of the retainer and his file.

On August 7, 1987, respondent wrote to grievant advising that the matter would be listed for disposition later that month. On November 12, 1987, respondent sent a copy of the complaint to grievant. However, the complaint was not filed until January 1988.

At the ethics hearing, grievant testified that he had not had any further communications from respondent since November 1987, and was not aware that his matter was still pending. Respondent admitted that he was negligent in handling the matter and alleged that he had become addicted to cocaine. Respondent testified that he entered into rehabilitation therapy which enabled him to resume the practice of law and carry out his obligations as an attorney.

The Special Master, in recommending a nine-month suspension in this particular matter, concluded that respondent acted with gross negligence, contrary to *RPC* 1.1(a), failed to act with reasonable diligence, contrary to *RPC* 1.3, failed to adequately communicate with his client, contrary to *RPC* 1.4, failed to adequately communicate the basis of his legal fees, contrary to *RPC* 1.5(b), and made misleading communications, contrary to *RPC* 7.1(a).

*THE SEGNELLO MATTER*

Grievants, Gregory and Gary Segnello, were involved in a three-car automobile accident in November 1983. Gregory Segnello was the operator of one vehicle and his brother, Gary, was a passenger in the same vehicle. At the request of grievants' father, respondent undertook representation of grievants. During the course of the representation, respondent communicated mainly with grievants' father.

In November 1985, respondent filed a complaint on behalf of both grievants for the injuries sustained in the accident. Respondent originally advised the grievants that they should each receive $6,000 upon settlement of the matter.

Both grievants, who were over the age of eighteen, apparently signed blank releases, with the understanding that each would be receiving $6,000. The matter, however, was actually settled for a total of $2,000. The grievants' dissatisfaction with this result prompted their ethics complaints.

The Special Master, in recommending that respondent receive a public reprimand in this matter, found a conflict of interest in representing both the driver and passenger in the civil action, contrary to *RPC* 1.7(a).

## OFFICE OF ATTORNEY ETHICS AUDIT

In 1986, William J. Morrison, a certified public accountant, was retained by the Office of Attorney Ethics ("OAE") to perform an audit of respondent's books and records. The audit began in December 1986, and ended in August 1987. The audit established that respondent was guilty of numerous recordkeeping improprieties, in violation of *R.* 1:21-6. No misappropriation was found.

At the ethics hearing, respondent admitted to the various recordkeeping improprieties. The Special Master recommended that respondent receive a private reprimand, as well as instructions in proper recordkeeping.

## THE DEROCCO MATTER

In February 1985, grievant, Gustavo DeRocco [had purchased an automobile garage business and assumed payments for an auto lift left on the premises]. The lift did not work properly. The leasing company subsequently failed to repair the lift, as promised. * * * [G]rievant stopped making payments on the lift, pending repair by the leasing company.

The leasing company never repaired the lift and filed a lawsuit against grievant in August 1985. Grievant gave respondent $200 and a desk that grievant valued at $2,000, in return for respondent's representation in the lawsuit. Grievant did not receive any further communication from respondent. Respondent claimed that he failed to file an answer because grievant did not provide additional funds to him.

Thereafter, representatives of the leasing company removed the lift from grievant's place of business. Grievant consulted a new attorney and learned that the leasing company had obtained a default judgment against him for $4,000.

The Special Master concluded that respondent failed to communicate with this client, contrary to *RPC* 1.4, and displayed a lack of diligence, contrary to *RPC* 1.3, and recommended a six-month suspension.

## THE FINUCANE MATTER

On August 6, 1984, grievant, Richard Finucane, met with respondent and discussed possible legal recourse against his employer. Grievant had been employed at that company since May 1972, and believed that he was about to be terminated from his job as a result of sex discrimination. Grievant gave respondent a notebook wherein grievant had recorded certain incidents that, in his view, constituted sex discrimination. After reviewing the notebook, respondent advised grievant that he had a strong case of sex discrimination.

On August 17, 1984, the company terminated grievant's employment. The company gave grievant a proposed termination agreement providing, among

other things, for continuation of full salary, health insurance, and an employee stock purchase plan for approximately three months after termination.

In late August 1984, grievant again met with respondent, this time to discuss the proposed termination agreement. At that time, grievant paid respondent $500 to represent him. On August 29, 1984, respondent wrote to the company, stating that he had advised grievant of his potential sex discrimination claim against the company. The letter also contained a counter-proposal, which requested, among other things, continuation of grievant's salary for two years after termination.

In September 1984, grievant paid respondent an additional $250 for representation in the matter. On November 20, 1984, upon advice from respondent, grievant filed a charge of sex discrimination against the company with the Equal Employment Opportunity Commission ("EEOC"). Thereafter, grievant's contacts with respondent became difficult and sporadic.

In December 1984, the company wrote to respondent and advised him that grievant had been properly treated by the company and that no laws had been violated. The company also suggested that grievant accept the termination agreement originally proposed. Respondent failed to advise grievant that the original termination offer was still open.

In February 1985, respondent showed grievant a proposed complaint reciting the sex discrimination allegations against the company. This complaint was never filed.

In August 1985, the EEOC concluded that there was no reasonable cause to believe that grievant's allegations of sex discrimination were well founded. No further action was taken by respondent.

The Special Master concluded that respondent made misleading statements regarding his services, contrary to *RPC* 7.1(a), failed to communicate with his client, contrary to *RPC* 1.4, and failed to act diligently, contrary to *RPC* 1.3. He recommended that respondent be publicly reprimanded for this behavior.

*THE HOFFMAN MATTER*

Sometime in 1983, grievant, Hans Hoffman, retained respondent in connection with a claim against the seller and the manufacturer of a faulty wheeltractor. Respondent filed a lawsuit against the seller and the manufacturer in April 1984.

Recognizing the need for expert testimony, respondent obtained a statement of fees from an expert in December 1983. He did not forward this fee statement to grievant until April 1984.

In August 1984, the manufacturer filed a motion to dismiss the complaint. In October 1984, the court granted respondent 30 days to file an amended complaint against the manufacturer setting forth a more specific cause of action. Respondent failed to file the amended complaint, as a result of which the complaint against the manufacturer was dismissed in November 1984. Grievant had difficulty communicating with the respondent during the pendency of the matter and was not advised by him that the complaint against the manufacturer had been dismissed.

In October 1984, respondent received a letter from his adversary seeking answers to interrogatories that were sent in August 1984. Grievant had previously supplied respondent with handwritten answers. Respondent failed to formalize and submit these answers. In December 1986, the complaint against the seller was dismissed for failure to answer interrogatories. Respondent failed to inform grievant of the dismissal.

The Special Master concluded that respondent displayed a lack of diligence, contrary to *RPC* 1.3, and failed to communicate with his client, contrary to *RPC* 1.4, and recommended a six-month suspension.

*PATTERN OF NEGLECT*

Respondent, through his attorney, acknowledged that he was guilty of a pattern of neglect, a pattern of failure to communicate with clients, a pattern of lack of diligence, and generally a pattern of lack of professional conduct. Respondent alleged that he has a compulsive personality that caused him to become addicted to cocaine. His drug habit cost him $2,000 per week. Respondent has undergone extensive treatment, and testified that he was free of any substance abuse.

The Special Master noted that, over the course of the many ethics matters, he recommended three private reprimands, three public reprimands, and a total of 48 months of suspension from the practice of law. The Special Master also recommended that "during the time of suspension and for two years after his reinstatement to practice [respondent] be required, as a condition of the restoration of his license and as a condition of retaining his license, [to] be subjected to twice weekly tests of blood and/or urine to assure that he has not lapsed back into his habit."

[Footnotes omitted.]

Based on those factual findings, the Board concluded that

[r]espondent is guilty of a wide range of misconduct in the 16 docketed matters before this Board, including gross negligence, contrary to *RPC* 1.1(a) in *Rykowski*, and recordkeeping improprieties discovered during the OAE audit, in violation of *R.* 1:21–6 and *RPC* 1.15. In most of the matters, respondent failed to act diligently, contrary to *RPC* 1.3, and failed to communicate with clients, contrary to *RPC* 1.4. While these various ethics transgressions are serious, this Board is particularly disturbed by the pattern of neglect exhibited by respondent. *RPC* 1.1(b).

This pattern of neglect, together with respondent's repeated failure to communicate with clients and consistent absence of professional conduct, shows that respondent generally abandoned his clients. Respondent's occasional attempts to represent clients did not approach zealous representation. His sporadic and conflicting representation of the grievant in *Turan* and the incomplete documents that he prepared to dissolve that business arrangement exemplify this lack of zealous representation.

Respondent contested much of the testimony by the many grievants who came before the Special Master. He was neither candid nor remorseful in his

testimony, until confronted with the two pattern of neglect charges, which embraced all of the matters. He then admitted to his wrongdoing. He testified further that he had been addicted to cocaine during the time of his unethical conduct and that he suffers from a compulsive personality. Respondent indicated that, at some future time, he intended to offer the testimony of a psychiatrist. This Board is mystified, as was the Special Master, as to why respondent did not offer such testimony at any point during these lengthy proceedings. In any case, such expert testimony regarding respondent's alleged afflictions was not forthcoming.

It is clear that respondent is guilty of unethical conduct. This Board, therefore, has the task of recommending the appropriate discipline. The purpose of discipline is not to punish the attorney, but to protect the public from the attorney who does not meet the standards of responsibility required of every member of the profession. *Matter of Templeton*, 99 *N.J.* 365, 374 [492 *A.*2d 1001] (1985). The quantum of discipline must accord with the seriousness of the misconduct in light of all relevant circumstances. *In re Nigohosian*, 88 *N.J.* 308, 315 [442 *A.*2d 1007] (1982). Mitigating factors are therefore relevant and may be considered. *Matter of Robinovitz*, 102 *N.J.* 57, 62 [505 *A.*2d 595] (1986). In addition, "contrition and * * * admission of wrongdoing are mitigating factors in [respondent's] favor." *In re Rosenthal*, 90 *N.J.* 12, 17 [446 *A.*2d 1198] (1982).

In the face of overwhelming testimony and documentation, respondent ultimately, if belatedly, admitted that he had exhibited a pattern of neglect. The Board considered respondent's admission of wrongdoing as a mitigating factor.

More significantly, respondent claimed an addiction to cocaine over the course of his misconduct. This addition was offered not as a defense to the misconduct, but in mitigation therefor. Respondent's attorney referred the Board to *Matter of Willis*, 114 *N.J.* 42 [552 *A.*2d 979] (1989). The attorney in that case received a six-month suspension for failing to file a federal income tax return, gross neglect in six separate matters, knowingly issuing a check drawn on insufficient funds, and charging unreasonable fees. Willis experimented with illegal drugs, such as cocaine and marijuana, and was severely alcoholic during the time of his misconduct. He subsequently took great pains to rehabilitate himself and offered the testimony of several witnesses in this regard. The Court concluded, "[i]n the absence of respondent's remarkable recovery, we would incline towards a suspension of more than one year." *Willis, supra,* at 50 [552 *A.*2d 979].

The *Willis* case, however, is not analogous to this matter, as respondent's attorney contends. Here, respondent admitted solely to an addiction to cocaine, an illegal drug. Unlike the attorney in *Willis*, respondent offered no supporting testimony regarding his addiction or his rehabilitative efforts. In addition, the Court's focus in *Willis* was on the attorney's recovery from alcoholism, rather than illegal drug use. Moreover, the Court in *Matter of Stein*, 97 *N.J.* 550 [483 *A.*2d 109] (1984) stated that an attorney's addiction to cocaine and amphetamines cannot be considered a mitigating factor. The Court concluded that, "[i]f anything, it should be considered an aggravating factor because this

Respondent, while a member of the Bar, committed a crime by the illegal acquisition of controlled substances." *Stein, supra,* at 556 [483 *A.*2d 109].

In light of the foregoing and of the barren record regarding respondent's addiction and subsequent rehabilitation, the Board declines to view his addiction to an illegal substance as mitigation for the pattern of neglect displayed by respondent.

There are numerous instances where a pattern of neglect, in conjunction with other misconduct, has resulted in long-term suspensions. *See, e.g., Matter of Templeton,* 99 *N.J.* 365 [492 *A.*2d 1001] (1985) (attorney received a *de facto* five-year suspension for exhibiting a pattern of neglect, failure to carry out contracts of employment, and failure to cooperate with ethics committee in 11 cases); *Matter of O'Gorman,* 99 *N.J.* 482 [493 *A.*2d 1233] (1985) (attorney received a three-year suspension for pattern of neglect, failure to carry out contracts of employment and failure to communicate with clients in nine cases). Serious displays of attorney negligence, in several instances, have resulted in disbarment. *See, e.g., In re Goldstein,* 97 *N.J.* 545 [482 *A.*2d 942] (1984) (attorney disbarred for pattern of neglect, gross negligence, misrepresentations to clients in 11 cases and practicing law contrary to DRB agreement); *Matter of Dailey,* 87 *N.J.* 583 [436 *A.*2d 1341] (1981) (attorney disbarred for pattern of neglect, failure to carry out contracts of employment, disregard of a court order of ineligibility, and failure to maintain proper records in 18 cases); *Matter of Spagnoli,* 115 *N.J.* 504 [559 *A.*2d 1352] (1989) (attorney disbarred for pattern of neglect, gross neglect, failure to communicate with clients, misrepresentation to court and lack of cooperation in disciplinary proceedings).

Nonetheless, disbarment is reserved for cases where "the misconduct of an attorney is so immoral, venal, corrupt or criminal as to destroy totally any vestige of confidence that the individual could ever again practice in conformity with the standards of the profession." *Matter of Templeton, supra,* [99 *N.J.*] at 376 [492 *A.*2d 1001]. Respondent came perilously close to, but did not cross, that threshold.

This Board acknowledges that respondent has not previously been found guilty of unethical conduct and that he did not personally benefit from his misconduct. In addition, respondent finally did admit his wrongdoing. Nevertheless, several of his clients, such as the grievants in *Elefante,* were financially harmed by his misconduct, and all of his clients were frustrated and distressed. Moreover, in the words of the Special Master, "[t]he doubt, distrust and disrespect which [respondent] sowed in those with whom he came in contact will spread and infect all those members of society with whom his former clients converse, and then on to others in geometric proportion."

[Footnote omitted.]

Before us, respondent has emphasized his drug addiction as the cause of his numerous derelictions, and has pointed to his efforts towards rehabilitation. Those efforts include admission to private hospitals, psychotherapy, and weekly attendance

at meetings of both Narcotics Anonymous and Alcoholic Anonymous. For these efforts, respondent deserves to be commended. For disciplinary purposes, however, they come too late. We continue to believe that "the public may be best protected by a policy that encourages [substance-abusing] lawyers to seek rehabilitation at the earliest possible moment." *In re Willis*, 114 *N.J.* 42, 49, 552 *A.*2d 979 (1989). Respondent committed his infractions years before he sought help. As he wrote in his brief to this Court, "[u]ntil my hospitalization in December of 1987, I denied my illness, not only to myself, but to my family and the whole world." Given the fact that this Court appointed the Special Master in December 1987, the same month in which he was first hospitalized, we cannot find that respondent sought "rehabilitation at the earliest possible moment." In fact, he did not seek help until he was in trouble with the disciplinary system. Although we recognize that we have much to learn about drug addiction, *ibid.*, we remain committed to the proposition that such addiction is neither a defense to nor a mitigating factor in attorney discipline.

Nor can we ignore the different legal consequences attendant on the abuse of cocaine as distinguished from alcohol. Attorneys who use cocaine or other controlled dangerous substances necessarily violate the law. We would be remiss in condoning such activity, even to the extent of allowing it to ameliorate the penalty in a disciplinary proceeding. As the Special Master concluded,

> the addiction evokes sympathy. But, an attorney who becomes so involved does serious harm to his clients and brings disgrace upon all members of the legal profession. Such conduct evinces a disrespect for the very laws he is sworn to uphold. [Respondent's] problem can explain, in human terms, the negligence * * *, but [it] cannot constitute an excuse.

We decline to consider cocaine addiction as a mitigating factor, especially when, as here, the affected lawyer does not readily admit his problem and seek help.

Respondent shall be suspended for three years, subject to proof at the end of that period that he has not used drugs during the period of suspension, that he is competent to prac-

tice law, and that he has satisfactorily completed the Skills and Methods courses.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

So ordered.

*For Suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

It is ORDERED that MARC J. TERNER of WAYNE, who was admitted to the bar of this State in 1976, be suspended from the practice of law for a period of three years, effective as of August 22, 1990, and until further Order of this Court; and it is further

ORDERED that prior to an application for restoration, MARC J. TERNER shall be required to provide proof that he has not used drugs during the period of his suspension, that he is competent to practice law, and that he has satisfactorily completed the Skills and Methods courses offered by the Institute for Continuing Legal Education; and it is further

ORDERED that MARC J. TERNER reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that MARC J. TERNER be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that MARC J. TERNER comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended attorneys.